**Patricia A. HOLLINGER, Administratrix of the Estate of Germaine S. Hollinger, Deceased, Appellant,**

v.

**WAGNER MINING EQUIPMENT COMPANY, A Division of Paccar, Inc.**

No. 81–1359.

United States Court of Appeals, Third Circuit.

Argued Sept. 21, 1981.

Decided Dec. 22, 1981.

Rehearing Denied Jan. 15, 1982.

---

Paul J. Senesky (argued), Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., for appellant.

David L. Grove (argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellee; David N. Hofstein, Philadelphia, Pa., of counsel.

Before ALDISERT, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

#### *Issue*

This is an appeal from the grant of summary judgment in favor of the defendant, Wagner Mining Equipment Co. (Wagner). In this diversity action plaintiff seeks damages for the death of her decedent, Germaine S. Hollinger (Hollinger), who was killed on May 27, 1977 at an underground mine operated by Bethlehem Mines Corp. (Bethlehem) in Morgantown, Pennsylvania, after being struck by a scooptram[1] operated by another Bethlehem employee, Irvin Hartz. The scooptram was manufactured by Wagner in 1969 and was put into operation in November of that year by Bethlehem.

---

1. As defined by the district court, "A scooptram, also known as an LHD (load-haul-dump) unit, is a trackless, low profile diesel powered vehicle used to transport earth and ore in underground mines." *Hollinger v. Wagner Mining Equipment Co.*, 505 F.Supp. 894, 895 n.1 (E.D.Pa.1981).

Plaintiff's claim, which evolved in its present form during discovery, is that the scooptram was sold in an unsafe condition as defined by section 402A of the Restatement (Second) of Torts [2] because it was not equipped with an automatic warning device at the time of its sale. Wagner moved for summary judgment, essentially contending that the undisputed facts prove that the alleged defect did not cause Hollinger's death. The district court granted summary judgment to Wagner, finding that no genuine issue exists as to the material fact that "the decedent saw and heard the approaching scooptram," and therefore that "the presence or absence of any audible or visual device, whose sole function would have been to alert the decedent that the scooptram was coming, could not have caused the accident...." *Hollinger v. Wagner Mining Equipment Co.*, 505 F.Supp. 894, 899 (E.D.Pa.1981). The court held in the alternative that even if causation could be established, there could be no liability imposed on the manufacturer under section 402A(1)(b) of the Restatement (Second) of Torts because Bethlehem had removed the operative manual horn with which the scooptram was originally sold, thereby effecting a "substantial change" in the scooptram's condition. *Id.* at 900–02. We find that summary judgment on either of these grounds was inappropriate on the record before the district court and remand.

## II.

### Facts

The following facts are not in dispute. At the time of the accident, Hollinger and his helper, Rump, were working in the "607 East Production Drift" of the Bethlehem mine along with Hartz, who was operating the scooptram. The diagram in the record of this portion of the drift shows a main tunnel at least 10 feet wide, off the north side of which were three entries, numbered, from west to east, 03, 02 and 01. More than 50 feet east of entry 01 was another small entry in which was located an explosive storage box. To the farthest east was the water valve from which the scrubber tank of the scooptram was filled. Across the tunnel from entry 01 (*i.e.* to the south of that entry) was a water drainage manway. It was a common practice to assign three persons to work in one production drift.

Hollinger and his helper were drilling and blasting oversized chunks of ore which had been placed in the 03 entry. The third employee, Hartz, the scooptram operator, was drawing muck from the 01 and 02 entries and dumping it at a point west of the 03 entry. Hollinger left his helper in the 03 entry and walked east in the direction of the 01 entry and the water drainage manway located directly across the tunnel from the 01 entry. At roughly the same time, Hartz noticed that the scrubber tank of the scooptram was empty. In order to refill the tank, he proceeded towards the water valve, located approximately 102 feet east of the 01 entry. As he was proceeding east in the tunnel, Hartz saw Hollinger standing at the entrance to the water drainage manway on the right side of the tunnel across from the 01 entry. Hartz testified that Hollinger turned to face the scooptram, that he saw the light on Hollinger's helmet, and that such a turn was in accordance with standard mine practice. Hollinger then stepped into the water drainage manway. At the time of this sighting, the scooptram was at a point between the 02 and 03 entries, approximately 100 to 150 feet away from the entrance to the water drainage manway. The scooptram was moving at approximately five miles per hour. Hartz was unable to see Hollinger or the entrance to the drainage manway again as he proceeded further down the tunnel,

**2.** Section 402A provides in relevant part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Pennsylvania has adopted section 402A. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966).

due to the fact that the driver's seat was located on the left side and the large scoop obscured his vision of the right side of the vehicle. As he passed the 01 entry, Hartz felt that the scoop was dragging and he consequently lifted the bucket a few inches and proceeded to the water valve. Upon reaching the water valve, Hartz looked back and saw Hollinger's body lying in the drift.

## III.

### A.

#### Summary Judgment

■ Rule 56 of the Federal Rules of Civil Procedure provides that a trial court may enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We have characterized summary judgment as " 'a drastic remedy' ", and have made clear "that courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties." *Ness v. Marshall*, 660 F.2d 517 at 519 (3d Cir. 1981) (quoting *Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir. 1974)). Moreover, "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "On review the appellate court is required to apply the same test the district court should have utilized initially." *Id.*

### B.

#### Proximate Cause

■ The first basis for the district court's grant of summary judgment was that the absence of an automatic warning device could not have caused the accident "because the decedent saw and heard the approaching scooptram." 505 F.Supp. at 899. The primary basis for this finding was the court's apparent inference that since there was evidence that Hollinger was aware of the scooptram's approach shortly before the accident, he remained aware of it up until the moment of impact. At his deposition, Hartz testified that when the scooptram was passing the 03 entry, he saw Hollinger across from the 01 entry and he saw him turn and acknowledge the scooptram's approach. However, there was also testimony, apparently uncontradicted, that the distance between the scooptram and Hollinger at this point was 100 to 150 feet. Weik Dep. at 29. Hartz testified that he was traveling at no more than five miles per hour at the time, Hartz Dep. at 34–35; thus, at least 14 to 20 seconds must have elapsed between the time of sighting and the time of impact. Therefore, even if Hartz' testimony establishes that Hollinger was aware of the scooptram when it was 100 to 150 feet away, it fails to establish conclusively that Hollinger was aware of the scooptram immediately before the impact.

Other evidence may suggest a different inference. The exact point of impact is unknown, but it is undisputed that Hollinger's body and effects were found in the tunnel east of the 01 entry, in the vicinity of the explosives storage box. Although Hollinger did not say anything to his co-worker before leaving the 03 entry, a possible inference from the evidence is that Hollinger was going for more blasting powder from the explosive storage box, located between the 01 entry and the water valve. Bethlehem Accident Report; Weik Dep. at 16, 23–24.[3] It is also apparently undisputed that the scooptram's route on this occasion,

---

3. According to Assistant Mine Superintendent Weik.

   Rump was Hollinger's helper, and they were preparing some large chunks for secondary blasting ... and they didn't quite have

enough powder to complete the number of chunks they were going to blast, and at that point, Rump—Hollinger didn't say anything to Rump that he was going for more powder,

proceeding past the 01 entry and on to the water valve, was a deviation from its previous pattern of turning into the 02 or 01 entry to continue its mucking operations.[4] MESA Report, App. at 81a; Weik Dep. at 17, 35–36. In view of this evidence, a jury might reasonably conclude that even if Hollinger had seen the scooptram when it was passing the 03 entry, he assumed that it was going to turn into the 02 or 01 entry as it had previously done, and therefore he continued to walk east towards the explosives storage box[5] with his back to the scooptram. Even if Hollinger heard the scooptram's continued approach, he may have been unaware of its exact location and unconcerned if he believed that it was going to turn off before reaching him.

The district court also stressed the evidence that the scooptram "lit up like a Christmas tree" and had a noise level comparable to a diesel truck,[6] and that Hollinger "had no known hearing or seeing problems." 505 F.Supp. at 899. This apparently led the district court to conclude that a reasonable jury must necessarily infer that the noise and light generated by the scooptram in normal operation would by itself have been sufficient to have alerted Hollinger to its approach.

However, there was testimony by plaintiff's expert, Lewis Barbe, that the normal operating noise of the scooptram, while loud, was "subconsciously nullified by people in mines," who "don't pay any attention because they assume the operator can see

them." This was the basis for Barbe's conclusion that "[s]ome type of a biodirectional alarm," set at a different decibel rating or frequency so as to identify it as a danger signal, was necessary to alert miners to the scooptram's approach and to the fact that the driver could not see where he was going. Barbe Dep. at 10–11. The sound and light generated by the scooptram itself were apparently not considered adequate warning by the Federal Mining Enforcement and Safety Administration (MESA) since its accident report recommended that scooptrams be equipped with audible warning devices. App. at 83a.

We recognize that under the circumstances of this case, plaintiff will not be able to produce any evidence of Hollinger's actions or state of mind during the crucial 14 to 20 second period.[7] Nonetheless, given the strict standard for summary judgment, we believe that the district court could not conclude as a matter of law that Hollinger was aware of the scooptram's presence immediately before the impact. Since a jury could reasonably conclude that he was not aware of the scooptram's presence at that time, it could also conclude that an automatic warning device would have alerted Hollinger to the scooptram's approach, and thus could have prevented the accident. Ordinarily a jury must determine the issue of proximate cause. We find that in this case plaintiff produced sufficient evidence to pose a triable issue.

---

he just left, but Rump knew that he was just going for more powder. Weik Dep. at 23–24.

4. There was testimony, however, that the scooptram had gone to the water valve on "a couple" of other occasions earlier in the shift. Hartz Dep. at 39.

5. Hartz testified that he saw Hollinger step into the water drainage manway across from the 01 entry, and assumed that he was doing so to get clear of the scooptram. However, Hartz indicated that there might have been other reasons for Hollinger to step into the manway which would be consistent with his resumption of walking towards the explosive storage box— for example, to "wash his glove." Hartz Dep. at 23–24, 33, 38.

6. The district court emphasized Hartz' testimony that the noise level was even higher when the scrubber tank was dry. 505 F.Supp. at 899. However, there was also testimony that the condition of the scrubber should have had no effect on the noise level. Weik Dep. at 27.

7. It is well-established that in the absence of evidence to the contrary, the decedent in a wrongful death action is presumed to have been exercising due care at the time of the accident. See, e.g., .Baltimore & Potomac R.R. v. Landrigan, 191 U.S. 461, 473–74, 24 S.Ct. 137, 140, 48 L.Ed. 262 (1903); Webb v. Martin, 364 F.2d 229, 231–32 (3d Cir. 1966); Morin v. Kreidt, 310 Pa. 90, 97, 164 A. 799, 800–01 (1933).

## C.

### Substantial Change

The alternate ground for the district court's grant of summary judgment, the "substantial change" in the scooptram subsequent to Wagner's sale, was based on the undisputed evidence that the scooptram had been equipped with a manual horn at the time of sale but that the horn had been removed sometime prior to the accident.

The issue of substantial change, like proximate cause, is generally one for the jury. *Merriweather v. E.W. Bliss Co.*, 636 F.2d 42, 44 (3d Cir. 1980). However, where no genuine issue of material fact is presented, the court may grant summary judgment. There is no dispute that the removal of the manual horn constituted a change. But "[i]t is obvious that not every change in a vehicle will relieve a manufacturer of liability" under section 402A of the Restatement (Second) of Torts. For a change to be considered "substantial" for this purpose, "the change must have some causal connection with the accident." *Dennis v. Ford Motor Co.*, 332 F.Supp. 901, 903–04 (W.D.Pa.1971), aff'd, 471 F.2d 733 (3d Cir. 1973). In other words, if the presence of a manual horn would not have prevented the accident then its removal cannot be considered a substantial change so as to preclude liability. *See Blim v. Newbury Industries, Inc.*, 443 F.2d 1126, 1128 (10th Cir. 1971) (Aldisert, J., sitting by designation); Comment, *Substantial Change: Alteration of a Product as a Bar to a Manufacturer's Strict Liability*, 80 Dick.L.Rev. 245, 250–51 (1976).

In considering the significance of the removal of the manual horn, the district court found that Hartz had in fact seen Hollinger "with ample opportunity to blow a horn if one had been mounted on the vehicle at the time." 505 F.Supp. at 901. The critical question, however, is not whether Hartz *could* have blown the horn but whether he *would* have blown it. As to that, plaintiff's evidence shows two separate bases on which a jury question has been made out.

Plaintiff's most vigorous argument is directed to the structure of the scooptram itself. The thrust of plaintiff's claim is that a manually-activated warning device, such as a horn, would be ineffectual because the scooptram is constructed so that the vision of the driver who is seated on the left-hand side is restricted by the placement of the large scoop. Plaintiff asserts that in such a situation only an automatic warning device, which is not dependent for its efficacy on the driver seeing whether anyone is in the path of the scooptram, can adequately protect those working in the vicinity of the vehicle. It is undisputed that after Hartz sighted Hollinger he was no longer able to see the area of the tunnel in which Hollinger had been. If Hartz could not have seen that Hollinger was no longer in a position of safety, a jury might conclude that he would have had no reason to have sounded a manual horn. Indeed, Assistant Mine Superintendent Weik testified that "if there would have been a horn on the scoop, I doubt whether Hartz, the operator, would have blew [sic] the horn." Weik Dep. at 30.

The other difficulty with relying on the manual horn in this case is Hartz' testimony, relied on by Wagner, that Hollinger was aware of the scooptram's approach. As noted above, Hartz testified that as he passed the 03 entry, he saw Hollinger acknowledge the scooptram's approach and step into the water drainage manway, and he assumed that Hollinger was waiting for the vehicle to pass. Hartz Dep. at 23–24, 31, 33, 38. Again, if Hartz assumed Hollinger was aware of the scooptram, a jury might conclude he would have had no reason to use the manual horn. Parenthetically, we note that there is no testimony by Hartz that he would have used the manual horn if it had been on the scooptram. Neither party asked him that question on his deposition, and we cannot assume what the answer would be were he asked at trial. We merely find that on the present state of the record, the issue remains open.

Our function in reviewing a grant of summary judgment is to ascertain if there is any genuine issue of fact or permissible inference from fact which must be left to

the jury. In view of the evidence, a jury might reasonably conclude that the presence of a manual horn would not have prevented the accident. In that event, its removal would not have constituted a substantial change sufficient to preclude liability under section 402A.

*Hanlon v. Cyril Bath Co.*, 541 F.2d 343 (3d Cir. 1975), and *Schreffler v. Birdsboro Corp.*, 490 F.2d 1148 (3d Cir. 1974), relied on both by Wagner and the district court, are distinguishable. In *Hanlon*, plaintiff employee was injured when he accidentally activated a press brake from which he was attempting to extract a piece of metal that had become stuck. The press brake had originally been equipped with a foot pedal that required the operator to exert a considerable amount (sixty-five pounds) of pressure to activate. The employer had substituted a much more easily activated, movable foot switch similar to a dictaphone foot pedal. In sustaining the jury's verdict for defendant, we held that "[i]n relation to danger of accidental activation, this substitution of a significantly different and much more sensitive starting mechanism was a 'substantial change in the condition in which ... [the press brake] was sold,' within the meaning of section 402A." 541 F.2d at 345.

In *Schreffler*, plaintiff was injured when a load of hot steel billets which had been accidentally released by a fellow employee pushed him against the machine on which he was working. Plaintiff had been standing at a "transfer table" attaching chains to a load of steel in preparation for its removal by a crane. The transfer table, as originally sold by defendant manufacturer, consisted of a series of parallel rails with gaps between them. The employer, however, had filled these openings with steel plates to enable the transfer table workers to use them as walk-ways. We affirmed a directed verdict for defendant on the ground that the transfer table was "so substantially modified that it was then feasible to use the equipment in a manner different from that which would have been expected from observation of the original design." 490 F.2d at 1153.

In both *Hanlon* and *Schreffler*, there was little doubt that the product as originally designed would have prevented the accident, and that the modification made by the employer was a proximate cause of the injury. In this case, however, plaintiff contends that the manual horn with which the scooptram was originally equipped would not have prevented the accident, and therefore that its removal could not have contributed to Hollinger's death. Thus, there is a factual issue presented as to whether an essential ingredient of substantial change, a, causal connection between the modification and the resulting injury, which was patently present in *Hanlon* and *Schreffler*, is missing in this case.

## IV.

### *Feasibility*

Wagner contends that even if we find that there are jury issues as to causation and substantial change, we should affirm the grant of summary judgment because plaintiff failed to demonstrate any genuine issue of fact as to whether the absence of an automatic warning device rendered the scooptram "defective" and "unreasonably dangerous" as those terms are defined in section 402A of the Restatement (Second) of Torts. Although Wagner suggests that the district court "found" that the scooptram was not "defective" or "unreasonably dangerous", we see no such "finding" in the district court's opinion. In the portion of the opinion devoted to the substantial change issue, the court expressed doubt as to the feasibility of an automatic warning device. That discussion also touched upon the issue of proximate cause. The relevant portion reads:

[P]laintiff has not demonstrated how such [an automatic warning] device would operate. Her proposed expert testified at his deposition that such a device would operate independently of the operator whenever there was a blind spot. However, he conceded that there was always a blind spot on the scooptram. The expert also confessed that he did not

know how such a device could be designed. Assuming for the moment that he would qualify as an expert, his unsupported conclusions will not create a genuine issue as to any material fact. More importantly, this same expert acknowledged that even if an automatically activated audible device operating independently of the driver were practicable, and even if the scooptram had been equipped therewith, he could not conclude that the accident would have been prevented by installation of one. In short, plaintiff has not produced any evidence suggesting the feasibility of designing an automatic warning device, whether it would have had any positive effect, and whether the use of this device would have prevented the instant accident.

505 F.Supp. at 902–03 (footnotes omitted). The district court did not explicitly state that this was an independent basis for the entry of summary judgment, as it did with the other two holdings, and did not relate the discussion of feasibility to the ultimate issue of whether the product was "defective" or "unreasonably dangerous"; also it did not analyze all of the evidence plaintiff proffered on feasibility. Therefore, we are reluctant to expand this brief and ambiguous passage into a separate basis for the district court's grant of summary judgment.

■ We agree with Wagner that plaintiff has the burden of demonstrating that the automatic warning device which she propounds was in fact feasible. "[I]n establishing that the design in question [is] defective, the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances." *Huddell v. Levin*, 537

F.2d 726, 737 (3d Cir. 1976) (interpreting New Jersey law of strict liability); *Jeng v. Witters*, 452 F.Supp. 1349, 1359 (M.D.Pa. 1978), *aff'd*, 591 F.2d 1335 (3d Cir. 1979) (applying *Huddell* to interpretation of Pennsylvania law).

■ The evidence on this issue consists only of the deposition testimony of plaintiff's expert, Lewis Barbe. As we read Barbe's testimony, it is unclear which of two possible types of automatic warning devices he was describing: one which would selectively activate itself only when needed, or one which would activate itself whenever the vehicle travels in a forward direction, the time when the driver's visibility is most severely restricted.[8] Wagner points to Barbe's inability to describe fully how a device such as the former could be designed and argues that the other type of device would become ineffective because its signal would be ignored over time. While the feasibility of a selectively activating device does seem somewhat questionable to us, Barbe suggested some possibilities for such a design and testified that there were similar devices commercially available, named a number of specific brands, and referred to other underground equipment which is equipped with some type of automatic warning function. Barbe Dep. at 16–17, 23–26. As to a device which would operate simply on forward motion, Barbe rejected defense counsel's suggestions that a continuously operating alarm would become part of the ambient light and noise of the mine and thus be subconsciously ignored by those working in the area.[9] He testified that he had experience with vehicles equipped with warning devices which operated "most of

---

8. Because of the placement of the large scoop at the front of the scooptram, visibility of the driver of the scooptram differs from that of drivers of other large vehicles, which require backup alarms. Barbe testified that when the driver "is going in reverse and he is sitting right there and he can see where the front is, you don't need [the warning device] because he can see right where he is going." Barbe Dep. at 17.

9. Barbe responded:

Absolutely not, because what you're saying does not happen. Experience indicates just

the reverse; that the more they hear these, the more they pay attention to them.

\* \* \* \* \* \*

It is a hazard. It's like when they say, "Fire in the hole," and everybody starts yelling, "Fire in the hole," everybody then immediately knows and takes precautions and you can say that for ten years or fifteen years and there are certain things that subconsciously activates a person and its been proven over a period of time that these things work ....

Barbe Dep. at 27–29.

the time," *id.* at 29, and insisted that the sound made by such devices was distinguishable from the noise of machinery which becomes part of the ambient sound level of the mine. *Id.* at 18–20.[10]

Wagner offered no expert witness of its own to refute Barbe's testimony or to support its claim that an automatic warning device was not feasible. While Barbe's testimony is at times lacking in specificity and clarity, we must construe it in the light most favorable to plaintiff. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We find that the issue of the feasibility of an automatic warning device is a close one, particularly because plaintiff has not provided a clear and concise diagram or verbal picture of the type of device it posits. However, in face of the record before us, we cannot conclude that no genuine issue is presented.[11]

The district court also included in the feasibility discussion the separate question of whether plaintiff established that an automatic warning device would in fact have prevented Hollinger's death. While plaintiff's expert acknowledged, as the district court emphasized, that he could not positively state that the presence of an automatic warning device would have prevented the accident in this case, he did testify that he had "a reasonable certainty" that it would have, based upon his knowledge and experience that "these alarms really work and people do pay attention to them." Barbe Dep. at 21–23. As the Oregon Supreme Court stated in *Baccelleri v. Hyster Co.*, 287 Or. 3, 597 P.2d 351, 353 (1979):

It is true there is no testimony that this accident would not have happened if an alarm had been provided, but there seldom is such evidence in a case in which the charge is failure to warn. It is sufficient to prove causation if there is evidence or the jury can draw an inference that a warning is generally effective in preventing such accidents.

We agree with that approach, which is consistent with our earlier holding that on the record in this case the issue of proximate cause is to be decided by the jury.

### V.

For the foregoing reasons, we will vacate the district court's grant of defendant's motion for summary judgment, and remand

---

**10.** In light of this testimony, we cannot agree with the dissent's statement that "[a]ppellant's expert conceded that a constantly operating alarm would be undesirable." At 411. Moreover, the dissent impinges on the role of the factfinder when it contends that "one must inevitably conclude" that a selectively activating device would have to be operated manually by the driver, and would therefore amount to "nothing more than a horn." At 411. Barbe expressly rejected the suggestion that a manual horn would be an adequate substitute for an automatic warning device, and emphasized the distinction between the two. Barbe Dep. at 16, 20–21. While the factfinder might properly choose not to credit this testimony, we do not think that it is appropriate for this court to conclude as a matter of law that it must "inevitably" do so, especially in light of the fact that Barbe's deposition is the only evidence on the subject. The dissent has construed the admitted ambiguities of Barbe's testimony in the light least favorable to the plaintiff, when our duty in reviewing the grant of defendant's motion for summary judgment is to do quite the reverse.

**11.** Plaintiff suggests that the district court improperly treated the question of whether a product is "unreasonably dangerous" as one to be decided by the judge and not the jury, based on what plaintiff asserts was an incorrect reading of the Pennsylvania Supreme Court's decision in *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978). Our review of the district court's decision convinces us that it analyzed the propriety of summary judgment under the traditional standard of sufficiency of the evidence to present a jury question, and not under a more relaxed standard, notwithstanding its statement that *Azzarello* permits that approach. 505 F.Supp. at 898 & n.29. The court relied for its statement on *Bailey v. Atlas Powder Co.*, 602 F.2d 585, 587–88 & n.3 (3d Cir. 1979), and *Baker v. Outboard Marine Co.*, 595 F.2d 176, 181–82 (3d Cir. 1979), which do not discuss the countervailing precedent that a federal court sitting in diversity is not bound by state law when the division of responsibility between judge and jury is implicated. *See Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Huddell v. Levin*, 537 F.2d 726, 737 (3d Cir. 1976). In the posture in which this case reaches us we need not decide this issue.

for proceedings not inconsistent with this opinion.

ALDISERT, Circuit Judge, dissenting.

The majority have concluded that the evidence before the district court presented a triable issue in this proceeding in which appellant seeks to translate an accident in a coal mine into a products liability case. I disagree. I will give appellant an A for effort, but, with the district court, I am of the view that, on this record, the appellant's innovative theory cannot survive a motion for summary judgment.

Two major impediments prevent me from accepting appellant's convoluted theory, presented to Judge Troutman in the district court and repeated before this court. Each impediment constitutes an independent ground for granting the manufacturer's summary judgment motion.

### I.

I first clear away the semantic underbrush. The thrust of the plaintiff's case is that the manufacturer failed to equip the scooptram with a warning device. Appellant's expert conceded that a constantly operating alarm would be undesirable and instead presented a vague specification for an ideal "automatic" alarm that would operate only when the scooptram driver could not see people in the vehicle's path. Appellant's expert could not describe how such a selectively actuated device would operate, but one must inevitably conclude that the driver would have to activate it manually.[1] This being the sole theory to submit the 402A design defect to the jury, I have no difficulty concluding that the manufacturer met this requirement precisely.

Just as one may not hang a sign that reads, "this is a horse," around the neck of a cow and expect onlookers to regard the animal as anything other than a cow, neither should one expect others to be impressed by new labels for familiar pieces of machinery. The proposed quasi-automatic "warning device"—manually activated when circumstances so require—is nothing more than a horn,[2] and the undisputed fact is that the manufacturer equipped the scooptram with a horn that was removed sometime before the day of the accident. I would affirm the grant of summary judgment on this ground alone.

### II.

Even if this analysis is rejected on the theory that there is a difference between horns that are fully automatic, quasi-automatic, and purely manual, the uncontroverted facts show clearly that a warning device on the scooptram would not have prevented this unfortunate accident.

The purpose of a warning device is to alert those not already aware that a danger is present. Hollinger did not require warning: he had seen the scooptram coming toward him only seconds earlier. The operator testified that Hollinger saw the scooptram and, acknowledging its approach, signalled to the operator.[3] During the short interval between that signal and the impact, the machine was effectively its own warning device, reminding anyone nearby

---

1. Appellant's lawyer advanced the same theory at oral argument:

   JUDGE ALDISERT: The automatic [warning device] would be used under certain circumstances?

   COUNSEL: Those circumstances where there was a deviation. You don't have to run it all day.

   JUDGE ALDISERT: The theory then is that you should have an automatic warning device that would be only used where the driver could not see in front of him?

   COUNSEL: Absolutely and where he did not know where the people were.

2. Even pre-schoolers understand that a horn on a vehicle is sounded to announce the approach of the vehicle. For those with a penchant for authority, the dictionary defines this type of horn as "c) a device sounded to give a warning." Webster's New World Dictionary of the American Language (2d College Ed.).

3. In his deposition, the scooptram operator responded to questioning as follows:

   Q. Is it or was it a practice in the mine for miners who were on foot, when a scooptram was approaching them, to turn their lights, [their] helmet lights in the direction of the scooptram?

   A. Right, towards us.

   Q. Is that what Mr. Hollinger did?

   MR. SENESKY: Objection.

   THE WITNESS: Yes.

   App. at 130.

**412**

of its presence. The operator characterized the scooptram as lit up like a Christmas tree and producing a noise like a diesel truck.

Nevertheless, because it is not clear why Hollinger failed to get out of the machine's way, the appellant would let this case go to trial. It is one thing to proceed with trial because evidence in support of a summary judgment motion has been met by factual showings that raise a question of material fact; it is quite another to ask a jury to speculate what the decedent might have been thinking and whether a hypothetical alarm might have made him alter his actions. The scooptram operator's testimony is the only evidence that can be adduced on the causation issue. Appellant did not offer any testimony to counter this in the district court, nor is there any suggestion that trial will produce additional evidence. Accordingly, I would hold that whether the alleged design defect was the proximate cause of the death of appellant's decedent was not a question warranting trial.

### III.

For these separate reasons, I would affirm Judge Troutman's grant of summary judgment in favor of the manufacturer.