**CONTINENTAL DATA SYSTEMS, INC.**

v.

**EXXON CORPORATION, et al.**

Civ. A. No. 84–2538.

United States District Court,
E.D. Pennsylvania.

Jan. 10, 1986.

David Marion, Robert Swift Kohn, Savett, Marion & Graf, Philadelphia, Pa., for plaintiff.

Kell Damsgaard, Morgan, Lewis & Bockius, Philadelphia, Pa., for Exxon.

Anne Dixon, Philadelphia, Pa., for Geddes.

## MEMORANDUM

NEWCOMER, District Judge.

Continental Data Systems, Inc. ("Continental") brought this action alleging theft of trade secrets by Exxon Corporation ("Exxon") and the individual defendants. In addition to a variety of state law claims, Continental alleges that the defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").[1] I am now presented with a motion for summary judgment by Exxon. Exxon argues that plaintiff's RICO claim lacks merit because Exxon was not part of an "association in fact" with the individual defendants. While I am dubious about Exxon's contention, this issue does not defeat the motion. Rather, for reasons which will be fully elaborated below, I will grant defendant Exxon's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the RICO claim, and deny it in all other respects.

## I.  FACTS OF THE CASE.

Because defendant has moved for summary judgment under Rule 56, I must construe all evidence in the light most favorable to plaintiff. *See, Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981). Furthermore, the presence of any material issues of fact precludes the entry of summary judgment. *Id.* I am therefore adopting in substantial part the plaintiff's statement of facts in this case.

Plaintiff's First Supplemental Memorandum in Opposition to Defendant Exxon Corporation's Motion for Summary Judgment at 5–17 (hereinafter "Plaintiff's First Supplemental Memorandum").

### A.  *The Parties*

Continental is a start-up, high technology company. It was formed in July 1981. It became a Xerox value-added dealer for word processing equipment and, in January 1984, became an IBM value-added dealer for word processing equipment. It specializes in designing and licensing software tailored to the needs of the legal community and the hardware to make it run. It has grown from a handful of employees in 1981 to over 50 employees in the spring of 1985. Its revenues for the fiscal year ending June 1983 were $1.7 million, and its net income $83,000.

Exxon is one of the largest corporations in the world with 1983 assets of $62.9 billion, revenue of $88 billion and net income of $4.98 billion. Exxon Office Systems Co. ("EOS") was formed in 1981 as a division of Exxon Enterprises which itself is a division of Exxon Corporation. EOS resulted from the merger of three divisions which together had 6,000 employees. In 1983, EOS had assets of $201 million, revenue of $133 million and a net loss of $60 million.

In late 1982, EOS had approximately 20 branches in the United States. Paul Morris was Philadelphia branch manager, James Geddes was marketing manager, and Judith Raybuck was a senior sales representative. Faith Halpern was offered employment with EOS in November, 1982, but was told that she could not start work as a sales representative until late December.

### B.  *Development of Continental's Software*

Beginning in early 1982, Continental, which focused principally on the legal software market, decided to develop a no-fault software program to enable personal injury

---

**1.** This Court has previously granted in part Exxon's motion to dismiss for failure to state a claim under the Lanham Act, 15 U.S.C. § 1125(a), and the Sherman Act, 15 U.S.C. § 1.

attorneys to manage and control their caseloads of no-fault actions. Continental determined that no one else was marketing such software at the time. The software enabled an attorney to record and quickly access vital information in a case without fumbling through files of papers. The software tracked medical expenses, the identity of insurers, medical providers and critical deadlines. It could also generate letters and reports. Continental designed its package after interviewing numerous attorneys as to their specific needs and determining that such a program was not being marketed commercially.

In the spring of 1982, Continental began development of a personal injury program which incorporated the capabilities of the no-fault package but had expanded capabilities. The cost of developing the programs was in excess of $95,000. Initial versions were delivered to Continental's customers by November 1982. By early December 1982, Continental salespersons were given sales manuals containing sample output from the software programs. Each salesperson had a single manual. Selected pages of the manuals were used to show bona fide customers the capabilities of the software. In the unusual situation where the bona fide customer requested a copy of certain portions of the manual to make a decision, the customer was asked to agree orally to maintain the confidentiality of the manual. In addition, authority to leave the manual had to be obtained from Continental's Vice President of Sales. In the hands of a competitor, the manual was a virtual blueprint to enable the competitor to duplicate the output of Continental's software. When the software was licensed, a provision of the contract prevented unauthorized use or dissemination of the software and its manuals.

### C. *The Alleged Misconduct*

EOS lost $122 million in 1981 and $37 million in 1982. In 1982 and 1983, the Philadelphia branch failed to meet its sales quotas. During the first half of 1983, Paul Morris was informed that he was in jeopardy of losing his job because of his branch's poor sales performance.

Geddes became marketing manager for the Philadelphia area in September 1982. Geddes was in charge of a "team." Raybuck was a member of Geddes' team who specialized in selling EOS word processing systems to attorneys. Morris, Geddes and Raybuck were salaried EOS employees eligible to receive incentive pay if they met their sales quotas. At no time did Geddes ever meet his quota.

In November 1982, Raybuck complained to Geddes that EOS was losing sales to Continental in the legal market because of Continental's personal injury software ("PIP") program. Geddes regarded Continental as a viable competitor in the legal market but was unable to obtain any useful information about the company or its products. Geddes spoke to Morris about PIP and directed an employee to check with EOS' competitive department to determine whether EOS had a PIP program. Geddes learned that EOS' competitive department, which he regarded as very competent, did not know what a PIP program was.

Geddes then called Halpern, whom he had just agreed to hire but who continued to work for another firm until December 20, to set up a demonstration of Continental's PIP program at her office in the Atrium, 19th and Market Streets, Philadelphia. He specifically asked her to set up the demonstration with Tom Licorish, a Continental salesperson whose name was known to Morris, Geddes and Raybuck. Halpern arranged the demonstration for December 7, 1982 by representing to Licorish that she was a consultant for a law firm interested in Continental's PIP and no-fault programs.

Halpern and Geddes met in Halpern's office prior to the demonstration and discussed how Geddes should be introduced:

"Q. Okay. Prior to the demonstration did Jim Geddes come to your office?
A. Right before the demonstration.
Q. Okay. Did you talk with him before?
A. Yes. We went into my office. We only had a few minutes, and we chatted,

and I said, 'How should I introduce you?' And he said—we came up with that he was a friend of mine and a consultant from Chicago.

Q. Do you recall what name?

A. No, I don't." (Halpern Dep. 21). In fact, Geddes and Halpern did so represent at the demonstration. At no time during the demonstration did Geddes represent his true name, his employer or the purpose for which he wanted the demonstration because Geddes feared that if he did so, Licorish would not go ahead with the demonstration.

During the demonstration, which lasted two hours, Continental's word processing software was run on a Xerox 820 computer system. Between one hour and one and one half hours were devoted to explaining and discussing Continental's no-fault and personal injury software. That software was not demonstrated on the Xerox computer, but Licorish discussed all aspects of the software with Halpern and Geddes in order to make a sale. As part of his sales presentation and in response to their questions, Licorish showed them the output pages of the software from his sales manual. Geddes asked many questions about the software.

After the conclusion of the December 7, 1982 meeting, there is a divergence of testimony as to how the sales manual fell into defendant's hands. Licorish has testified that Halpern requested to borrow the manual to study it on behalf of her client. Licorish telephoned Continental's Vice President of Sales to obtain permission to do so. After receiving permission, Licorish explained to Halpern that the manual was confidential and that it must be returned within 48 hours. Halpern has testified that a day or two after the December 7, 1982 meeting, she spoke with Geddes on the telephone:

"Q. What was said during the conversation?

A. He said, 'Well, we really didn't get much,' something that we really didn't get much. And I said, 'Yes, there was no literature or anything.'

'Do you think we can get the notebook he showed us?' So I said, 'Well, I will ask.'

So I called Licorish and asked for a price breakdown of the equipment and the software and asked him if we could have the portion of the book that he had shown us." (Halpern Dep. 33–34). Licorish then delivered the manual to Halpern's office in the Atrium. Halpern then telephoned Geddes to say that she had the manual, and Geddes instructed her to give it to Raybuck at EOS' Christmas Party. Halpern made two photocopies of the manual, kept one and gave one copy to Raybuck at the Christmas Party and Raybuck thanked her.

After Geddes returned from the December 7, 1982 meeting, he drafted and sent to Morris, EOS' branch manager, a three-page memorandum about Continental's products and told Morris that he had attended the Continental demonstration. Geddes glanced at the manual at the Christmas Party, discussed it with Raybuck within the next five days and he (or someone else) told Morris they had the manual. At Geddes' and Raybuck's request, Morris assigned Barsigian, EOS' customer support manager to assign personnel to prepare a legal software application. Geddes represented to Morris that with the legal application, he would have no trouble competing with Continental. Barsigian assigned Cindy Yellin and Tina Jackson to prepare the software application. Raybuck met with Yellin and Jackson, specified what she needed in the package, gave them form letters and reviewed their work. They completed the application in one month working on a part-time basis. The legal software application was demonstrated to Geddes and Raybuck in March 1983 and his salesmen demonstrated it to customers. The software application was also sent to EOS headquarters in Stamford, Connecticut and made available to other branches.

In May 1983, Licorish was contacted by a personnel recruiter, Pat Sweeney, who is the husband of another EOS sales employee, Linda Sweeney, to see if he might be

interested in new employment. Licorish met with Sweeney on May 11, 1983 and Sweeney told him he would set up an interview for Licorish with EOS. On May 16, 1983, Licorish was interviewed for a job by Morris. At a second meeting with Morris on May 23, 1983,[2] Morris told Licorish that he wanted another person to interview him and that Licorish "knew" this person because Licorish had given him a demonstration in December 1982. That person was Geddes. Licorish met with Geddes for three hours in late May 1983. At this meeting, Geddes told Licorish "I hope you are as big a scoundrel as I am." (Licorish Test.Prel.Hear., p. 93). Geddes also said, "This was something we had to do. We did it. If you were in my position, you would have done the same thing if you were getting the hell kicked out of you on the marketplace." (Licorish Test.Prel.Hear., pp. 77–78). At a later meeting, Geddes acknowledged to Licorish that he had "used" Continental's manual.

### D. *Impact*

In the twelve months after EOS introduced its personal injury software in March 1983, Continental's sales of its no-fault and personal injury software actually declined. Continental began receiving reports in mid-1983 from its sales personnel that EOS was also marketing legal software. EOS made at least one sale of its legal software. Continental's Expert Report concludes that there is a high degree of similarity between the input and output of the Continental and EOS personal injury software, and that some portions of the EOS information is a verbatim copy of Continental's information.

## II. THE RICO CLAIM

Before discussing the substance and merits of defendant Exxon's RICO claim, it is necessary to outline the structure of the statute in the civil context. Plaintiff is proceeding under Section 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1964(c) provides for a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962," and allows treble damages when a violation is shown.

Section 1961 defines some of the terms in Section 1962(c) which are elements of a violation:

> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity; (5) "pattern of racketeering activity" requires at least two acts of racketeering ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity;

"Racketeering activity" consists of specified state law offenses punishable by imprisonment for more than one year, or various federal offenses. 28 U.S.C. § 1961(1).

Plaintiff's position is that Morris, Geddes, Halpern and Raybuck, all employees of Exxon Office Systems, constituted an enterprise through which Exxon engaged in a pattern of racketeering activity. Plaintiff's First Supplemental Memorandum at 17.[3] Plaintiff argues that defend-

---

**2.** At this meeting, Morris asked Licorish for a list of customers to whom Licorish had sold Continental equipment. (Licorish Dep. 215–216).

**3.** Plaintiff also continues to contend that Exxon acted through its Exxon Office Systems (the "enterprise"), an unincorporated division of Exxon, to perform Exxon's alleged acts of racketeering. In my Memorandum and Order of January 4, 1985 at 11–12, I rejected plaintiff's contention that Exxon and Exxon Office Systems were distinct entities, and concluded that Exxon could not be both the violator and the enterprise under RICO. *See, B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628 (3d Cir. 1984). Although plaintiff continues to advance this position, it has failed to provide me any

ant Exxon used Geddes' "team" at Exxon Office Systems, an "association in fact to misappropriate Continental's information about its software so that Exxon could profit therefrom." Plaintiff's First Supplemental Memorandum at 18.

■ Defendant Exxon in its summary judgment motion mischaracterized plaintiff's position as asserting that Exxon was not the "person" for the purposes of the statute, but was part of an association in fact of the defendants. Memorandum of Law in Support of Exxon's Motion for Summary Judgment at 4. Exxon further argues that plaintiff has failed to establish the existence of an enterprise comprised of an association in fact. As Exxon and Continental both indicate, the existence of such an enterprise comprised of an association in fact is governed by the test laid down in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To show an association in fact, one must establish (1) the existence of an ongoing organization, (2) the functioning of the associates as a continuing unit, and (3) the existence of the enterprise separate from the activity in which it engages. *Id.* at 583, 101 S.Ct. at 2529.

■ Plaintiff and defendant Exxon differ as to whether Exxon is to be included in the association in fact. Plaintiff, the party required to establish such an enterprise, excludes Exxon from the alleged association. Excluding Exxon, plaintiff persuasively argues that an association in fact among the remaining defendants exists. The Geddes "team" was an ongoing organization which functioned as a unit and, as plaintiff asserts, "conducted its industrial espionage separate from [Exxon Office Systems'] regular business of selling computer equipment." Plaintiff's First Supplemental Memorandum at 18. Therefore, failure to establish an association in fact cannot form the basis for an entry of summary judgment on the RICO claim.

I do believe, however, that summary judgment as to Exxon on the RICO claim is

appropriate in this case. Having concluded that the Geddes "team" constitutes for the purpose of this motion an association in fact, and therefore an enterprise within the meaning of the statute, it remains for plaintiff to show facts that establish Exxon violated section 1962(c). To establish this violation, plaintiff must show that Exxon, employed by or associated with the enterprise, the Geddes "team", conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity, paraphrasing Section 1962(c). In other words, the facts read in the light most favorable to plaintiff must establish that Exxon was associated with or employed by the Geddes "team," and engaged in a pattern of racketeering activity through the Geddes "team."

■ As a preliminary observation, the language of RICO, and section 1962(c) in particular, envision a particular relationship between the "person" performing the wrongful conduct and the "enterprise." The RICO "person" is the active wrongdoer, while the RICO "enterprise" is a passive instrumentality or mechanism through which the "person" performs the predicate acts. This understanding comports with the Congress' expressed desire to use RICO to attack the infiltration of "legitimate" business by organized crime, while not restricting the reach of the statute to the organized crime context. *See, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. ——, ——, 105 S.Ct. 3275, 3284–85, 87 L.Ed.2d 346, 357–58 (1985); *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 633–34 (3d Cir.1984).

In the instant case, Continental has failed to adduce facts which demonstrate that Exxon, rather than the Geddes team—which comprises the RICO "enterprise," according to Continental—has engaged actively in the performance of racketeering activities. Plaintiff has not shown that Exxon's policy, either formal or informal, required or encouraged performance of the predicate acts. Nor has plaintiff estab-

legal basis for altering my conclusion. I therefore decline to do so.

lished that Exxon directed this conduct, or knowingly adopted it during its course. To be sure, Exxon acted indirectly through its employees, including the Geddes "team," even in the performance of the wrongful conduct upon which plaintiff bases this lawsuit. This is necessarily the case because of the nature of the corporate form. But to recast the facts to attribute to Exxon the active role in the commission of the predicate acts belies any reasonable interpretation of the facts. The mere fact that the "team" functioned as a unit and was given sales quotas is inadequate to establish that Exxon conducted the Geddes team's affairs through a pattern of racketeering activity. It turns the facts on their head.

The only sense in which one may colorably attribute to Exxon a violation of section 1962(c) is through the principles of agency and *respondeat superior*. Under ordinary principles of agency, an employer is liable for the wrongs of its employee if the employee acted within the scope of his employment, or if he acted with apparent authority. *See*, Restatement (Second) Agency § 219. While the rule has ancient lineage, its modern justification resides in the allocation of risk. Prosser and Keeton, *The Law of Torts* 500 (5th ed.1985).

> The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. *They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them;* and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public and so to shift them to society, to the community at large.

*Id.* at 500–01 (footnote omitted). Thus, when an employer seeks to profit from a business, and in the course of conducting

that business torts will occur from time to time, it has been deemed just for the employer to bear the consequences of those wrongs. These principles apply both to common law torts, *Gleason v. Seaboard Air Line R. Co.*, 278 U.S. 349, 49 SCt. 161, 73 L.Ed. 415 (1929), and to a wide range of federal statutory wrongs, *see, e.g., American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (non-profit association held civilly liable for antitrust violations of its agents committed with apparent authority).

Whether *respondeat superior* liability attaches under RICO has been the subject of substantial controversy, in both the courts and the literature. *Compare, Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20 (N.D.ILL.1982) (no *respondeat superior* liability under RICO where corporate defendant's employees defrauded plaintiffs) and *Dakis v. Chapman*, 574 F.Supp. 757 (N.D.Cal.1983) (no *respondeat superior* liability under RICO for securities law violations by lower level corporate executive), with *Bernstein v. IDT Corp.*, 582 F.Supp. 1079 (D.Del.1984) (apparent authority of employee sufficient to impose RICO liability on employer "enterprise") and *Morley v. Cohen*, 610 F.Supp. 798, 811 (D.Md.1985) (same). *See also*, Hellerstein and Klinger, "Derivative Liability under RICO: No Room for *Respondeat Superior*," 1985 ALI–ABA Video Law Review: Civil RICO Litigation After *Sedima* 185; Blakey, "The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg*," 58 *N.D.L.Rev.*, 237, 286–320 (1982). The statute does not explicitly address the issue. Such silence could be understood to imply that ordinary agency principles attach, and hence *respondeat superior* liability as well. *See, Bernstein, supra*, 582 F.Supp. at 1083 ("I perceive nothing in RICO or its legislative history which would suggest that the normal rules of agency law should not apply to the civil liability created by the statute"). Also, the fact that RICO provides for treble damages does not necessarily bar application of *respondeat superi-*

*or* within its rubric. *American Society of Mechanical Engineers, supra,* 456 U.S. at 574–76, 102 S.Ct. at 1947 (application of treble damages provisions of antitrust laws under *respondeat superior* consistent with statutory purpose). I believe, however, that the application of ordinary agency principles runs counter to the intended structure and operation of RICO civil liability.

In *B.F. Hirsch v. Enright Refining Co., Inc., supra,* 751 F.2d at 633, the Third Circuit Court of Appeals held that the corporate person charged with the RICO violation cannot be the same entity as the "enterprise" under section 1962(c). The court explained: "It is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity in some circumstances." *Id.* at 634. To allow liability to be attributed to the "enterprise" because it employed the RICO "person" would place the onus of the RICO violation on the "enterprise." It would place the corporate "enterprise" in the same position, subject to the same liability, as the employee "person." It makes little sense to require that the "enterprise" and the "person" be distinct, but then to impute liability from the "person" to the "enterprise" as a matter of course when the "enterprise" employs the "person." Such a result is simply inconsistent with the framework of the statute and the intent of Congress.

*American Society of Mechanical Engineers, supra,* does not mandate a contrary result. *Cf., Bernstein, supra,* 582 F.Supp. at 1083. That case holds that the policy of *respondeat superior* liability attaching when an agent acting with apparent authority violates the antitrust laws is consistent with the liberal remedial goals of the antitrust laws. It does not hold that an agent acting with apparent authority neces- sarily causes *respondeat superior* liability to attach under all federal statutes with remedial goals.

■ The Supreme Court stated in *Sedima, supra,* 473 U.S. at ——, 105 S.Ct. at 3286, 87 L.Ed.2d at 359–60, "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, ... but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purpose.' " In this instance, too broad a construction of the statute's remedial provisions would operate to defeat the structure established in the statute and to convert it into a blunt instrument, contrary to the intent of Congress. For that reason, I conclude that defendant Exxon cannot be held liable on the RICO count in this action on the basis of *respondeat superior.* Because I concluded previously that the evidence presented by plaintiff does not support a finding of RICO liability against Exxon as the active participant in racketeering activity, I will grant summary judgment in favor of Exxon on that claim.

## III. JURISDICTION OVER STATE LAW CLAIMS

In its second amended complaint, plaintiff asserted diversity of citizenship as an alternative basis for federal jurisdiction.[4] Exxon argues that because diversity jurisdiction is determined as of the date the action was commenced, the original inclusion of non-diverse defendants bars subsequent creation of diversity jurisdiction by dismissal of the non-diverse defendants. This is not so.

■ It is clear that "jurisdiction is tested by the facts as they existed at the time the action was commenced." *Field v. Volkswagonwerk AG,* 626 F.2d 293, 304 (3d Cir. 1980). *See also, Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957). Thus, a party may

---

**4.** Jurisdiction over the state claims was originally premised on pendent jurisdiction principles. I have now dismissed the last federal claim against defendant Exxon, so that jurisdiction can no longer be premised on pendent jurisdiction of the state law claims. *See, United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

not change his place of domicile after commencing suit in order to manufacture diversity of citizenship and hence federal jurisdiction. *Lang v. Windsor Mount Joy Mut. Ins. Co.,* 487 F.Supp. 1303 (E.D.Pa.1980). Similarly, "jurisdiction cannot be conferred retroactively by the subsequent substitution of a diverse claimant for a non-diverse party." *Field, supra,* 626 F.2d at 304.

▮ On the other hand, nothing prevents a plaintiff from dismissing claims against non-diverse defendants, to create diversity jurisdiction. It is the facts as they existed when the suit was filed, rather than the parties to the action, which may not be manipulated to create diversity jurisdiction. *Cf. Lang, supra,* 487 F.Supp. at 1307 (dismissal of defendant to create diversity jurisdiction not permitted *solely* because defendant was indispensible party to the action).

In the instant case, plaintiff is a Pennsylvania corporation and defendants Exxon and Geddes are both citizens of New Jersey. The other two defendants when this case was originally filed, both Pennsylvania citizens, have been dismissed from the case. As a result of the complete diversity as between plaintiff and both defendants, this court has jurisdiction over all state claims against Exxon and Geddes.[5]

## IV. THE STATE CLAIMS

The remaining claims against Exxon, and the remaining subjects of this motion are state law claims arising out of the conduct of Exxon's employees. Count II alleges that Exxon wrongfully appropriated Continental's trade secrets. Count III pertains to harm caused by Exxon's possession, use and disclosure of Continental's business information through the use of deception. Counts IV and V sound in the tort of fraudulent misrepresentation, depriving

Continental of its right to exclusive use of the information contained in the sales manual, and inducing reliance on the misrepresentation. Count VI alleges unfair competition. And VII alleges conspiracy among the defendants to effect the misappropriation.

▮ The question whether proprietary information constitutes a trade secret is an issue of fact, ordinarily resolved by the factfinder after full presentation of evidence. *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.,* 569 F.2d 286 (5th Cir.1978). But factual issues are subject to summary judgment whenever the law as applied to uncontroverted facts shows that the movant is entitled to judgment. *See, e.g., Sims v. Mack Truck Corp.,* 488 F.Supp. 592 (E.D.Pa.1980).

The essential elements of a claim for wrongful appropriation of business information in Pennsylvania are:

(1) Plaintiff is the owner of a trade secret.

(2) Plaintiff disclosed the trade secret to defendant; or defendant wrongfully took the trade secret from plaintiff without plaintiff's authorization.

(3) Defendant was in a legal relation with reference to plaintiff as a result of which defendant's use or disclosure of the trade secret to plaintiff's detriment is wrongful.

(4) Defendant has used or disclosed (or will use or disclose) the trade secret to plaintiff's detriment; or, defendant, who knew or should have known of plaintiff's rights in the trade secret, used such secret to plaintiff's detriment. Milgrim, Trade Secrets § 7.07[1] (footnotes omitted).

*Greenberg v. Croydon Plastics Co., Inc.,* 378 F.Supp. 806, 811 (E.D.Pa.1974).[6] While

---

**5.** Plaintiff also argued in its First Supplemental Memorandum at 19–20, that 42 Pa.C.S.A. § 5535 somehow operated to expand federal jurisdiction. Plaintiff need not rely on this statute, and I therefore decline to address it.

**6.** Defendant suggests that breach of a confidential relationship is required to make out the

claim, but that is not necessarily the case. The cases which require that element concern the disclosure of proprietary information by former employees of the plaintiff. *See, e.g., Van Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 213 A.2d 769 (1965); *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244 (3d Cir. 1985). *Cf., Sims, supra* (information disclosed

wrongful appropriation of business information is a necessary element of the tort, even wrongful appropriation is not actionable unless the information in question is a trade secret. *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 268, 213 A.2d 769 (1965). "The starting point in every case of this sort is ... whether, in fact, there was a trade secret to misappropriate." *Id.*

As was recently observed, "[a]lthough the issue is easily framed, the resolution is more difficult, for the law provides no precise definition or litmus test of what constitutes a trade secret." *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 421 (E.D.Pa.1980) (Becker, J.). Pennsylvania, however, has adopted the language of the *Restatement of Torts* § 757, comment b (1939), which reads in pertinent part:

A trade secret *may* consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it....

The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. *Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used....*

It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use.... *Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.* (Emphasis added.)

Chief Judge Lord analyzed this definition well in *Croydon Plastics, supra,* 378 F.Supp. at 812:

The owner of a trade secret must take reasonable precautions to protect its secrecy. The secrecy in which a purported trade secret is shrouded need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosure to unauthorized parties. The degree of secrecy must be such that it would be difficult for others to obtain the information without using improper means.

. . . .

The owner of a trade secret, unlike the owner of a patent, does not have a monopoly over the process or formula. He is only protected from other persons' gaining access to it either by stealing it directly from him, or by having another to whom it was lawfully disclosed do so. Others in the field are free to arrive at precisely the same method and to use the method so long as they obtain their knowledge through their own independent efforts.

■ In the instant case, defendant argues that the sales materials acquired from Continental are forms and data which are "standard, common place and well-known to personal injury attorneys." Memorandum for Summary Judgment at 21. Plaintiff's own employees admit that to be true. The information used to select or create the programs' output was obtained from interviews with lawyers who allowed plaintiff to copy their files, and from copying forms from books. (Deposition of Rosenfeld at 43–45). "Plaintiff cannot usurp standard data or forms from another industry and claim it as plaintiff's secret." Memorandum for Summary Judgment at 21. In general, Exxon relies on that portion of the Restatement which states that "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated

---

in course of unsuccessful negotiations of licensing agreement). I believe it is only in the employer-employee context that the "gravamen of the action is the abuse of confidence." *Van Products, supra,* 419 Pa. at 254, 213 A.2d 769.

The Restatement of Torts § 757 recognizes both forms of the tort, requiring either a breach of confidentiality or acquisition of the trade secret by wrongful means to make out a cause of action.

by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret."

The fact that individual forms and samples found in the sales materials were compilations of public information does not preclude a finding that the combination of the included elements affords a plaintiff competitive advantage and is not itself in the public domain. *See, Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 433 (3d Cir.1982); *Anaconda, supra,* 485 F.Supp. at 422. The combination of information contained in the sales materials reflected market research performed by plaintiff and decisions to include and exclude elements from a larger pool of data. It is this, rather than the data contained in the individual forms known generally among personal injury lawyers, which may contain a sufficient degree of novelty, however slight, to be excluded from general knowledge, and may qualify the sales manual as a trade secret. *See, Croydon Plastics, supra,* 348 F.Supp. at 812 (slight advance over general knowledge may qualify for trade secret protection).

In addition, Continental took significant precautions to limit the distribution and use of information contained in its sales manuals and the information disclosed to purchasers of its software. Company rules required sales people to obtain approval from Continental's Vice President and assurances of confidential treatment from prospective purchasers before portions of the sale manual were lent to the prospective purchaser. As part of the transaction, the buyer agreed to prevent unauthorized use or dissemination of the software and its manuals. Based on the evidence before me, I am unable to say that the market research information reflected in the selection of output for Continental's software was so freely disseminated that it may not be accorded trade secret status.

The only remaining issue is whether Exxon used the information contained in the sales manual to the detriment of Continental. During the twelve month period following Exxon's introduction of its personal injury application to its records processing software, Continental experienced a significant decline in sales. Exxon used the information acquired from Continental to prepare its personal injury application, but only one customer agreed to purchase from Exxon its personal injury application; it was never delivered.

Continental argues that sales by Exxon of its personal injury application were not necessary to harm Continental. Rather, merely marketing Exxon's personal injury software application, which included information misappropriated from Continental, "increased [Exxon's] credibility with customers in the legal marketplace and decreased Continental's credibility as the sole supplier of the product." Plaintiff's Second Supplemental Memorandum at 14–15. While I foresee substantial difficulties in proving the contention, I believe that plaintiff is entitled to present its evidence on causation.

For the foregoing reasons, I will deny Exxon's motion for summary judgment as to the state law claims presented in this case.

### ORDER

AND NOW, this 10th day of January, 1986, it is hereby Ordered that defendant Exxon's motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment is GRANTED on Count I of the Second Amended Complaint, and DENIED in all other respects.

Judgment is entered in favor of defendant Exxon and against plaintiff on Count I of the Second Amended Complaint.

AND IT IS SO ORDERED.