**GEOFREEZE CORP.**

v.

**C. HANNAH CONSTRUCTION CO.**

Misc. No. 83–0223.

United States District Court,
E.D. Pennsylvania.

July 24, 1984.

Robert D. Powell, Joseph, Powell, McDermott & Reiner, P.C., Washington, D.C., Catherine M. Lecky, Norristown, Pa., for Geofreeze Corp.

Peter F. Marvin, Miller, Schreiber & Sloan, Philadelphia, Pa., for C. Hannah Const. Corp., Buckley & Co., Inc., the Conduit & Foundation Corp., & Elliot-Lewis Corp.

Charles S. Shapiro, Jr., Miller, Schreiber & Sloan, Philadelphia, Pa., for General Reinsurance Corp., Aetna Ins. & Cas. Co., Standard Fire Ins. Co., North America Reinsurance Corp., Fidelity & Deposit Co. of

Maryland, Employers Reinsurance Corp. & Pennsylvania Nat. Mut. Cas. Ins. Co.

## MEMORANDUM

GILES, District Judge.

After initiating an action against C. Hannah Construction Company (Hannah) for breach of a construction contract, Geofreeze Corporation (Geofreeze), filed a second amended complaint adding counts against Buckley & Company, Inc., the Conduit Foundation Corporation and Elliott-Lewis Corporation (the Joint Venture) for tortious interference with contract and tortious interference with business expectancies. The Joint Venture has filed a motion for partial summary judgment to dismiss the tortious interference counts. This motion shall be granted.

## FACTS

The City of Philadelphia awarded the Joint Venture a contract for construction work on the Northeast Water Pollution Control Plant. The Joint Venture subsequently contacted Geofreeze to discuss the possibility of subcontracting. Under a subcontract, Geofreeze would employ its ground freezing technique to keep the ground from caving in during the construction work. In late April, 1982, an agreement was reached between the Joint Venture and Geofreeze.[1] To fulfill the City's minority contractor requirements, the Joint Venture contracted with Hannah as the minority subcontractor. Hannah, in turn, contracted with Geofreeze in accordance with the Joint Venture's agreement with Geofreeze. Hannah was responsible for paying Geofreeze. Hannah submitted invoices to the Joint Venture for expenses incurred, including bills from Geofreeze. Upon receiving these invoices, the Joint Venture made payments to Hannah. It, in turn, paid Geofreeze. It was understood by Geofreeze that the Joint Venture would guarantee payments to Geofreeze by or on behalf of Hannah in the event Hannah was unable to make the payments for any reason. Geofreeze contracted with a drilling subcontractor, the Nicholson Construction Company (Nicholson) to do the drilling necessary for the installation of the ground freezing system.

To fulfill its bonding requirement with the City, the Joint Venture secured a labor and materialmen's bond from eight surety companies. Receipt of the payment bond was conditioned on the Joint Venture's agreeing to indemnify the sureties and to hold them harmless should any claim be asserted against the payment bond.

A number of unexpected delays occurred putting the project behind schedule and causing cost over-runs. The contract between Geofreeze and Nicholson was a rental contract. Geofreeze had expected Nicholson's part of the job to cost between $40,000 to $60,000, but Nicholson's invoices totaled over $200,000. Disputes arose between Geofreeze and Nicholson over the amount Nicholson claimed Geofreeze owed in its July invoice. In September, Geofreeze acknowledged it owed at least $63,000 of the $84,000 billed. Despite this acknowledgement Geofreeze only paid Nicholson $30,000 with promises to pay the balance later. Nicholson had also submitted to Geofreeze its August and September bills in the amounts of $121,000 and $57,000. After it received only $30,000 for the July invoice in September, Nicholson, on September 30, 1982, contacted Buckley, as a member of the Joint Venture, and expressed its concern about Geofreeze's ability to pay. Nicholson also requested the name and address of the surety, indicating it planned to file a claim against the bond if other efforts to collect failed. Its collection efforts failed and neither Geofreeze nor Hannah paid Nicholson. After several fruitless attempts to obtain assistance from Buckley, Nicholson, on November 11, 1982, submitted a formal claim against the Joint Venture's bond through

1. Geofreeze submitted a proposal to the Joint Venture which was not fully integrated into the subcontract.

each of the sureties for the sum of $200,121.36. On November 23, 1982, Nicholson informed the Joint Venture that Geofreeze had "admitted an inability to pay." On November 24, 1982, Nicholson sent a letter to the Joint Venture via Buckley, notifying it that a formal claim had been filed against the bond through each of its sureties. Contemporaneously, Nicholson requested that the Joint Venture withhold funds from Geofreeze. Thereafter, the Joint Venture refused to pay Hannah for Geofreeze's invoices that had been submitted to Hannah for the weeks of November 22, 1982 through January 10, 1983. On December 17, 1982, Aetna Casualty & Surety Company wrote to Buckley requesting the Joint Venture to confirm in writing that Aetna's rights would "be 'protected at no cost, expense or obligation to Aetna Casualty.'"

In early December, Geofreeze told the Joint Venture it would attempt to work out an arrangement with Nicholson to hold the Joint Venture harmless. This protection was never provided. Geofreeze was told on December 28th that the Joint Venture would look on the situation "more favorably" if Geofreeze provided a payment and performance bond. Such a bond was never produced. It appears from the record evidence that the Joint Venture never gave Geofreeze formal notice of its decision to withhold payments.

## SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted when the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Courts must "resolve any doubts as to the existence of genuine issues of fact against the moving parties." *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982), *citing, Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981); *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981); *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882,

884 (3d Cir.1974). Moreover, inferences drawn "from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Id., citing Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d at 405; *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

## DISCUSSION

Geofreeze argues that certain inferences can be drawn from the material facts supporting its claims of intentional interference with contract and intentional interference with business expectancies which make the grant of summary judgment inappropriate in this case. Geofreeze contends that it can be inferred from the record evidence that the Joint Venture decided in late September 1982 "to drive Geofreeze off the job ... but waited until installation of freeze pipes and freezing was near completion until taking direct steps in this regard." Plaintiff's Opposition to Defendants' Motion for Summary Judgment ¶ 16. In support of this contention, Geofreeze argues that the Joint Venture failed to issue notice of breach or notice to cure before withholding payments and failed to utilize its arbitration provision with Hannah to attempt to work out a less drastic remedy. The Joint Venture apparently knew in August, 1982 that the project would be significantly delayed and that the delays would necessitate retaining Geofreeze's services for an indeterminate period of time. Geofreeze had originally been scheduled to leave the job in January, 1983. Furthermore, the Joint Venture never turned over any of the funds withheld from Geofreeze over to Nicholson. Finally, the Joint Venture billed the City over $900,000 for the Geofreeze system but only paid Geofreeze $423,938.71.[2] After carefully considering the record, this court has determined that the inferences drawn by Geofreeze either are not supported by the

**2.** There is no evidence as to whether the Joint

Venture actually received the amount billed.

record or do not raise material issues of fact.

The Restatement (Second) of Torts § 766 defines intentional interference with contract:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.[3]

Since probably none would dispute that the Joint Venture's notifying Hannah that it would no longer honor Geofreeze invoices was intentional, the question is whether this act was improper. Section 767 lists the factors to be considered:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and,
>
> (g) the relations between the parties.

Restatement (Second) of Torts § 767.

There is no doubt that the Joint Venture's conduct in refusing to pay Geofreeze's invoices exerted economic pressure on Hannah to cause Geofreeze to satisfy its indebtedness to Nicholson. Nevertheless, the Joint Venture acted according to pertinent contractual provisions and according to normal construction business customs when it exerted this pressure. Article IV of the contract between the Joint Venture and Hannah provides:

> If at any time there shall be evidence of any lien or claim for which, if established, Buckley or Owner of said premises might become liable, and which is chargeable to the Subcontractor ..., Buckley shall have the right to retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify itself and the Owner for any loss or damage, including attorney's fees, which either may sustain in discharging such lien or claim.

Geofreeze had admittedly failed to pay Nicholson what even it considered to be the full amount due. Hannah, as the next subcontractor in the tier, then failed to take steps to assure payment of Nicholson and thereby prevent the assertion of a claim against the Joint Venture. Hannah, in failing to so act, in effect caused a claim to be asserted against the Joint Venture. Thus, when Nicholson did in fact file a claim against the Joint Venture's sureties for $200,121.36, the Joint Venture simply acted in accordance with Article IV when it withheld payments. Article IV allowed the Joint Venture to withhold payments if it *might* be held liable. The right to withhold payments existed as long as the possibility of the Joint Venture being held liable existed when the payments were withheld. There is no requirement in Article IV that notice be given as a prerequisite to the withholding of payments.

The Joint Venture's failure to arbitrate the matter before withholding the payments does not evidence improper action. While the Joint Venture-Hannah contract does contain an arbitration clause, it does not apply to the situation in which the Joint Venture found itself—that is, threatened with liability due to a claim chargeable to Hannah. Article IV specifically applies to such situations and Article IV does not require the Joint Venture to obtain an arbitration decision before withholding payments.

The Joint Venture's decision not to turn over to Nicholson the amount withheld

---

**3.** Although stopping short of adopting it, the Pennsylvania courts analyze claims for intentional interference with contract in light of the Restatement (Second) of Torts § 766. *Adler,* *Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 431, 393 A.2d 1175 (1978); *Allied Security, Inc. v. Security Unlimited, Inc.,* 265 Pa.Super. 297, 302, 401 A.2d 1219 (1979).

from Geofreeze also fails to evidence improper action. As Geofreeze itself pointed out, there was a dispute between Geofreeze and Nicholson over the exact amount due Nicholson. Had the Joint Venture turned over too much to Nicholson, it would have risked liability to Geofreeze. Moreover, there is no evidence that the Joint Venture improperly applied these funds elsewhere. The Joint Venture also acted according to business customs when it withheld the payments.[4] For example, an Aetna Casualty interoffice memorandum indicates that the Joint Venture acted properly when it did not turn over to Nicholson the payments withheld from Geofreeze. It states:

> Nicholson's comments are well founded and it [sic] suggested that this matter be promptly brought to the attention of Buckley & Co. so that it can take the proper steps to withhold funds from Geofreeze, Inc. in a sufficient amount to cover the indebtedness asserted due by Nicholson. Consequently, if the amount due Geofreeze is determined to be valid, our Principal merely has to backcharge the holdback and issue its check directly to Nicholson or jointly to both Geofreeze and Nicholson, in satisfaction of the claim.

*See Leo Spear Construction Co. v. Fidelity & Casualty Co. of New York,* 446 F.2d 439 (2d Cir.1971) (bonding company privileged to withhold payment to contractor's suppliers pending determination of the contractor's status and resolution of who was entitled to possession of the contractor's material).[5] *See also Construction Business Handbook* § 38–11 (R. Cushman ed.

1978) (indicating general contractor will withhold payments from a subcontractor when that subcontractor has failed to pay its subcontractors). Consequently, inasmuch as the Joint Venture's motive was to protect its own interests and that it acted in accordance with its contract with Hannah and construction business customs, there are no material issues of fact that could lead a factfinder to find that the Joint Venture acted improperly.

■ Alternatively, the Joint Venture is entitled to summary judgment under Restatement (Second) of Torts § 773 which provides:

> One who by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract ... does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.[6]

Comment (a) to this section indicates that this rule "is of narrow scope and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." Restatement (Second) of Torts § 773 comment (a). *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons,* 365 F.Supp. 707, 720 (S.D.N.Y.1973), *modified,* 523 F.2d 1331 (2d Cir.

---

4. Comment j to § 767 states:

    [I]t has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances. Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not "sanctioned by the 'rules of the game.'"

5. *Leo Spear Construction* was decided under the first Restatement which set forth a different test for tortious interference. Rather than determining whether the actor's actions were intentional and improper, the question was whether one without a privilege caused a

third person not to enter into a business relation with another. Although the test applied in *Leo Spear Construction* was different from that applied now, the decision still serves to show that the withholding of payment is customary in the construction business when the withholder is trying to determine who is entitled to what.

6. Pennsylvania courts apparently have not interpreted claims under § 773. Nevertheless, because the Pennsylvania Supreme Court has analyzed claims in accordance with § 766, this court predicts that Pennsylvania would also analyze claims in light of § 773.

1975) (court found plaintiff infringed on defendant's trademark therefore defendant's warning to plaintiff of possible legal action to protect its trademark not actionable as tortious interference with contract).

The Joint Venture had a legally protected interest. Bonding companies guarantee that the principal will meet its obligations. They are not liable as long as the principal is solvent. *See e.g., Construction Business Handbook, supra,* § 38–13. The record indicates that at least one of the Joint Venture's sureties, Aetna Casualty, required confirmation by the Joint Venture, after Nicholson filed its claim, that the surety would be held harmless. Thus it was the Joint Venture, and not the bonding companies, that faced ultimate liability.

Furthermore, Nicholson had a right to bring an action against the Joint Venture for Geofreeze's and Hannah's failure to pay it under Pennsylvania's Public Works Contractors' Bond Law of 1967, 8 P.S. § 194(b). Nicholson exercised that right and brought such an action and the Joint Venture was found liable. Given the liability it faced, the Joint Venture most certainly had a legal right to take proper steps to protect itself. This it did according to the pertinent contractual provision and construction business norms. Because it acted as both its contract and construction business norms provided, it follows that the Joint Venture acted in a good faith manner and by appropriate means. Thus, all three of the tests have been met by the Joint Venture and it is entitled to summary judgment under § 773.

The Joint Venture finally argues that it is entitled to summary judgment on Geofreeze's claims for consequential damages because the Joint Venture's conduct was not the legal cause of these damages. The Joint Venture contends that Geofreeze was insolvent well before the Joint Venture refused to honor Geofreeze invoices. Consequently it was this insolvency, and not the Joint Venture's conduct, that caused any consequential damages sustained by Geofreeze. Section 774A of the Restatement

(Second) of Torts addresses damages. It states:

(1) One who is liable to another for interference with a contract or prospective contractual relation is liable for

. . . .

(b) consequential losses for which the interference is a legal cause.

The record evidence as to the legal cause of Geofreeze's consequential damages is less than clear. Consequently, summary judgment will not be granted on these grounds. However, since summary judgment is being granted on other grounds, dismissing the tortious interference claims, the consequential damages claim becomes moot.