

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-1994

# Schulman v. J.P. Morgan Inv. Mgmt. Inc.

Precedential or Non-Precedential:

Docket 93-1888

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Schulman v. J.P. Morgan Inv. Mgmt. Inc." (1994). *1994 Decisions.* Paper 133.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/133

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-1888
_____


ROBERT D. SCHULMAN, t/a MAXI'S EXPRESS,
Appellant

v.

J.P. MORGAN INVESTMENT MANAGEMENT, INC.;
WIDENER FUNDING CORP., INC.,
Appellees

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 92-cv-02853)
_____


Argued:  March 25, 1994


PRESENT:  HUTCHINSON, ROTH and ROSENN, <u>Circuit Judges</u>


(Filed September 13, l994

_____


Daniel J. Dugan, Esquire             (Argued)
Paul R. Rosen, Esquire
Spector, Gadon & Rosen, P.C.
29th Floor
1700 Market Street
Philadelphia, PA     19103
          Attorneys for Appellant

M. Melvin Shralow, Esquire
Frumkin, Shralow & Cerullo, P.C.
33rd Floor
1601 Market Street
Philadelphia, PA     19103

and

Leonard S. Baum, Esquire
Dean T. Cho, Esquire                    (Argued)
Haythe & Curley
237 Park Avenue
New York, NY     10017
                    Attorneys for Appellees

_____

OPINION OF THE COURT
_____


HUTCHINSON, <u>Circuit Judge</u>.


        Appellant, Robert D. Schulman ("Schulman"), t/a Maxi's Express ("Maxi's"), appeals an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment in favor of appellees, J.P. Morgan Investment Management, Inc. ("J.P. Morgan") and Widener Funding Corporation, Inc. ("Widener") (collectively "mortgagee"), on Schulman's claim that the mortgagee intentionally interfered with contractual relations between him, as tenant of a commercial building, and Widener Associates Limited Partnership ("WALP"), the landlord.[1] The order also granted summary judgment to the mortgagee on its counterclaim for a declaratory judgment that no valid, enforceable lease existed.

        For the reasons that follow, we hold the district court had subject matter jurisdiction over the question raised in Count I of Schulman's complaint and the portion of J.P. Morgan's amended pleading styled as a counterclaim despite WALP's absence

_____

[1]. WALP is not a party to this action.

as a party.  On the merits of that issue, we conclude that the district court correctly determined there was no existing lease with which the mortgagee could have tortiously interfered.  No lease existed between WALP and Schulman because the draft leases on which all of the negotiations between Schulman and WALP were based explicitly required execution by the landlord, an event that never happened.  In addition, even if we assume Schulman had a reasonable probability of obtaining a lease absent J.P. Morgan's and Widener's interference, Schulman's alternate claim for interference with a prospective contractual relation between himself and WALP fails as a matter of law because Morgan and Widener were acting in good faith to protect their legal and financial interests as mortgagee of the premises Schulman sought to lease from WALP.  Accordingly, we will affirm the district court's order in all respects.

## I.

In 1990 WALP, the owner of the Widener Building in Philadelphia, began a major renovation of the building to attract upscale tenants.  Jeffrey Kelter ("Kelter") was the principal acting on WALP's behalf regarding the renovation.[2]  Equitable Life Assurance Society of the United States ("Equitable Life")

---

[2].  WALP's general partners include Kelter, Peter Faherty ("Faherty") and 1339 Chestnut Street Associates.  Kelter and Faherty, along with Anthony Brady, are also the principal stockholders in FKB Management, Inc. ("FKB").  FKB manages the Widener Building under a management agreement with WALP dated July 18, 1991.  1339 Chestnut Street Associates has no affiliation with FKB.

began funding the building's renovation under a construction loan agreement with WALP dated June 8, 1990. The agreement included among other documents a Mortgage and Assignment of Leases and Rents, both of which were publicly recorded on June 15, 1990 under Pennsylvania's recording laws, 21 Pa. Cons. Stat. Ann. §§ 321-471 (deeds), 621-28 (mortgages) (1955 & Supp. 1994). Equitable Life assigned these documents to Widener under an "Assignment of Loan Documents" which was also publicly recorded on July 24, 1990. As recited in the Mortgage, WALP and Widener also executed a Permanent Loan Agreement dated June 8, 1990 in which Widener agreed to loan WALP up to $72 million for renovations, including a take-out of Equitable Life's construction financing. Both the Assignment of Leases and the Permanent Loan Agreement provided WALP would not lease any part of the building without the prior written consent of Widener, the assignee.

As of April 1, 1992, Widener had loaned WALP approximately $63 million to finance the renovations. Anne Pfeiffer, Vice President of both Widener and J.P. Morgan,[3] supervised the loan and was responsible for approving new leases on Widener's behalf.[4]

_____

[3]. J.P. Morgan acts as a trustee for a commingled pension trust fund and invests monies which come from over 157 domestic pension and employee benefit funds. J.P. Morgan, as trustee, wholly owns Widener which it formed for the sole purpose of providing financing to WALP.

[4]. Pfeiffer stated in her affidavit that typically her approval of a lease was not sought until the lease was signed by the prospective tenant. Once she approved the lease on behalf of Widener, the lease was executed by WALP as landlord.

In the summer of 1990 Kelter and Schulman began discussing plans for Schulman to operate Maxi's, a food establishment in the lobby of the Widener Building.[5] It is undisputed that both Kelter and Schulman anticipated that a lease would be executed for Schulman's establishment at some later date. Under the construction arrangement, the tenants received the first year's rent free of charge, which in Schulman's case amounted to $56,280. Schulman agreed to "contribute" this amount personally to Kelter for construction and obtained an offsetting construction allowance from Kelter. Schulman invested an additional $35,000 towards construction costs.

Kelter participated in and approved the design plans for Maxi's before construction began and forwarded them to Pfeiffer. According to Schulman, Kelter told him that he alone made decisions concerning the premises to be leased and that he never told Schulman that Widener and J.P. Morgan had to approve the lease. Schulman admits, however, that he knew Pfeiffer was connected with the lender and that she wanted to review the draft leases prior to execution. Construction began in September of 1991 despite the fact no lease had yet been signed.

Kelter sent Schulman three draft leases dated June 4, 1990, March 19, 1991 and August 6, 1991 respectively prior to commencing construction. Schulman reviewed these drafts himself and his counsel, Martin Herring & Associates and later Drinker,

---

[5]. Kelter allegedly advised Schulman that Maxi's had to be "absolutely first-class" because the renovations were aimed at obtaining first class tenants, but Schulman disputes this fact.

Biddle & Reath, also reviewed at least two of the drafts. Schulman noted several objections on the drafts, some of which were incorporated into subsequent drafts. According to Schulman, the third draft lease dated August 6, 1991, set forth all of the material agreed-upon terms. Schulman never objected to a provision appearing in all of the draft leases that expressly required WALP's approval and signature, as well as delivery of a fully executed lease, before any binding lease agreement would arise.

As construction continued, Schulman repeatedly tried to obtain an executed lease. Kelter reassured him each time that Schulman had a lease and had nothing to worry about. Though neither WALP nor Widener executed any of the draft leases, Schulman contends that a ten-year lease for the premises commenced in October or November 1991 when Schulman began construction of his establishment and the terms of this lease, agreed upon by August 6, 1991, are embodied in a fourth draft dated January 31, 1992 which FKB sent to Schulman on February 4, 1992.

Maxi's opened for business on December 2, 1991 despite the absence of an executed lease. After the renovated Widener Building's official grand opening celebration on December 12, 1991, Pfeiffer told Kelter she did not like Maxi's appearance and called it her "worst nightmare." Appendix to Brief of Robert D. Schulman ("App.") at A-91. Shortly thereafter, according to Schulman, Kelter began, for the first time, to express displeasure about Maxi's aesthetics and appearance and suggested

physical and operational improvements.[6]  Schulman agreed to the suggestions but could not implement them because of a lack of sufficient funds.  Kelter agreed to provide funding for the improvements but never did so.

On February 3, 1992, FKB employee Stephen Butte sent Schulman a letter confirming the amount of rent he now owed "pursuant to the terms of your lease."  App. at A-200.  On February 4, 1992, another FKB employee, Jennifer Pancoast, sent Schulman a second letter enclosing three "approved execution copies of the Lease Agreement for your space at The Widener Building."  App. at A-97.

In March of 1992 Kelter told Schulman he had no lease and ordered him to vacate the premises.  Kelter offered to compensate Schulman for his out-of-pocket expenses and prior rent checks.  Schulman refused the offer.  WALP filed suit for ejectment in the Philadelphia Court of Common Pleas on May 18, 1992.[7]  Kelter also moved for a preliminary injunction.  After four days of hearings, Kelter abandoned that motion.

---

[6].  According to Schulman, he learned the reason for Kelter's change of heart and growing displeasure with Maxi's only after Pfeiffer testified in state court on April 29, 1992 in support of WALP's motion for a preliminary injunction against Schulman. Schulman complains Pfeiffer was well aware of the construction and design plans for Maxi's long before its opening because she had received at least one draft of the lease in June 1991 as well as the architect's final design plans.  She also visited the construction site on several occasions, one as late as November of 1991.  At no time did she question Schulman's design for Maxi's.  She states she never really examined the establishment until December 12, 1991.

[7].  The ejectment action remains pending in state court.

In May of 1992 Schulman filed a complaint in the district court against J.P. Morgan and Widener alleging intentional interference with existing or prospective contractual relations. On January 19, 1993, J.P. Morgan and Widener moved to amend their answer to include what they called a counterclaim for a declaratory judgment that Schulman did not have a valid, enforceable lease. Ten days later they moved for summary judgment and sanctions.

On April 22, 1993, the district court granted J.P. Morgan's and Widener's motions to amend their answer and also concluded WALP was not an indispensable party on the counterclaim under Federal Rule of Civil Procedure 19. On August 19, 1993, the court granted the mortgagee's motion for summary judgment against Schulman on all claims, including the so-called counterclaim for a declaratory judgment, but declined to impose sanctions. In its opinion the district court held Schulman could not prevail on his Count I claim for intentional interference with an existing contract because both WALP and Widener were required to consent to any lease and therefore Schulman had no existing lease with WALP. It also held Schulman had no reasonable prospect of obtaining a lease. Alternately, the district court held any interference was privileged because J.P. Morgan and Widener, as mortgagee and assignee of the leases, had both a legal and financial interest in the transaction. Finally, the district court declared Schulman had no valid, enforceable lease for the premises. Schulman filed a timely notice of appeal.

II.

Because Schulman is a Pennsylvania citizen while J.P. Morgan and Widener are New York corporations with their principal places of business in New York and the claimed damages exceed $50,000, the district court had subject matter jurisdiction under 28 U.S.C.A. § 1332(a) (West 1993) when Schulman filed this case. We have appellate jurisdiction over the district court's final order granting summary judgment under 28 U.S.C.A. § 1291 (West 1993). Accordingly, all facts in the record, and all reasonable inferences deduced therefrom, will be construed in the light most favorable to Schulman, the non-moving party. Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Invs., 951 F.2d 1399, 1404 (3d Cir. 1991).

The district court's conclusion that WALP is not an indispensable party under Federal Rule of Civil Procedure 19(b) is reviewed for abuse of discretion. Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 403 (3d Cir. 1993).[8] We exercise plenary review over the district court's grant of summary judgment. Mellon, 951 F.2d 1399, 1404 (3d Cir. 1991); see Fed. R. Civ. P. 56(c). We also review a district court's decision to review or dismiss an action under the Declaratory

---

[8]. In Janney we held a district court's determination that an absent party is necessary under Rule 19(a), as opposed to indispensable under Rule 19(b), is subject to plenary review when the district court's determination is premised on a conclusion of law. Janney, 11 F.3d at 404. We will assume WALP is necessary under Rule 19(a) as discussed infra Part III A.

Judgment Act, 28 U.S.C.A. §§ 2201, 2202 (West 1982 & Supp. 1994), for abuse of discretion. See United States v. Pennsylvania, Dep't of Envtl. Resources, 923 F.2d 1071, 1073 (3d Cir. 1991).

III.

In response to the mortgagee's motion to amend its answer to assert as a counterclaim for a declaratory judgment its argument that no lease existed, Schulman argued in the district court that WALP was an indispensable party because its presence was essential to resolving the mortgagee's counterclaim. He also argued that a decision on the mortgagee's counterclaim would expose him to a substantial risk of inconsistent rulings if WALP were not joined because he would be collaterally estopped in the pending state court ejectment action by a declaratory judgment that no lease exists, but WALP would not be collaterally estopped if the district court decided a lease did exist.

The district court granted the mortgagee's motion to add the attack on the lease's existence that was called a counterclaim, expressly rejecting Schulman's contention that WALP was an indispensable party. The district court first noted Schulman would not be prejudiced by the proposed counterclaim because all questions relating to the existence of Schulman's lease were already at issue in Schulman's own claim of intentional interference with contractual relations. It also stated its ruling on the counterclaim would not interfere with or complicate the pending eviction action against Schulman in state court:

Whether Mr. Schulman had an enforceable lease or not is an entirely separate question from the one now in state court of whether Mr. Schulman has any rights against the landlord. Moreover, my ruling need not prompt those parties to dispute the ruling's collateral estoppel effect. If I find, after full and fair litigation on the merits, that there was no lease, Mr. Schulman cannot re-litigate that issue in state court. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 328 (1979). If, on the other hand, Mr. Schulman is concerned that the landlord will try to re-litigate the issue should I find there was a lease, he can accept the landlord's counsel's proposal that both Mr. Schulman and the landlord waive their rights to re-litigate the existence of the lease.

Schulman v. J.P. Morgan Investment Management, Inc., No. 92-cv-02853 (E.D. Pa. April 22, 1993) (footnote omitted) (order granting motion to amend). Finally, the district court stated "[w]hile the landlord may be an important witness on the issue of whether the requirements of a Widener Building lease were satisfied, he need not be a party to Schulman's suit against the building's lender for intentional interference." Id. (emphasis in original).

Schulman did not argue on appeal that the district court's order granting the mortgagee's motion to amend its answer to assert a counterclaim for a declaratory judgment was erroneous. Nevertheless, prior to oral argument we asked the parties to submit letter memoranda addressing the effect of WALP's non-joinder under Rule 19(b). See Finberg v. Sullivan, 634 F.2d 50, 55 (3d Cir. 1980) (in banc) (this Court on appeal can raise sua sponte problem of joinder without motion of

parties) (citing <u>Provident Tradesmens Bank & Trust Co. v.</u> <u>Patterson</u>, 390 U.S. 102, 111 (1968)).

The parties assumed that the only basis for jurisdiction was diversity. Therefore, in both the district court and here they briefed the jurisdictional issue in terms of the Rule 19 distinction between necessary and indispensable parties. In doing so, they overlooked the possibility of supplemental jurisdiction under 28 U.S.C.A. § 1367 (West 1993) that would be present if J.P. Morgan's amended pleading claiming that no lease exists is truly a counterclaim. <u>See</u> 6 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §§ 1414 at 99, 1422 at 170, 1436 at 274-76 (1990). J.P. Morgan's claim that no lease exists may, however, be no more than a defense to Count I of Schulman's complaint, not a counterclaim. <u>See</u> Fed. R. Civ. P. 8(c) (permitting court to relabel improperly labeled counterclaims and defenses). If this claim is mislabeled, consideration of WALP's status as a necessary or indispensable party under Rule 19 would be required.

Accordingly, whether the amended complaint's claim that the lease does not exist is treated as a counterclaim or a redundant defense is immaterial to the district court's jurisdiction over J.P. Morgan's contention that no lease ever existed. Moreover, if it is not a redundant defense, we disagree with the dissent's conclusion that the district court abused its discretion in addressing the merits of that contention and resolving it in favor of J.P. Morgan and against Schulman.

A.

Supplemental jurisdiction under section 1367 would not be available if the mortgagee's attack on the existence of the lease that is the basis of Count I of Schulman's complaint is not a true counterclaim, but consideration of the merits would nevertheless be proper unless WALP is not an indispensable party under Federal Rule of Civil Procedure 19(b).  For the reasons hereinafter given, we conclude WALP is not indispensable. Rule 19 sets forth a two step procedure for determining whether a person is an indispensable party.  See Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel, 895 F.2d 116, 121 (3d Cir. 1990); Abel v. American Art Analog, Inc., 838 F.2d 691, 694-95 (3d Cir. 1988).  Under the rule, a court must consider whether an absent party is "necessary" and "indispensable."  We will first consider whether WALP is a "necessary" party to this action.

Schulman argues the landlord is necessary under both Rule 19(a)(2)(i) and Rule 19(a)(2)(ii).[9]  Under Rule 19(a)(2)(ii)

_____

[9].  Federal Rule of Civil Procedure 19(a) provides, in pertinent part:

**Rule 19.  Joinder of Persons Needed for Just Adjudication**

(a) **Persons to be Joined if Feasible**.  A person . . . shall be joined as a party . . . if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties

we ask whether nonjoinder would subject Schulman to a substantial risk of inconsistent obligations if the district court decided there was a lease and WALP subsequently challenged this finding in state court.

We recognize that a decision in this action on the mortgagee's defense to Schulman's claim for tortious interference denying the existence of any lease between Schulman and WALP could affect the pending state court action, but whether WALP would be collaterally estopped is ultimately a matter for the state court to decide when the issue arises.  Cf. Janney, 11 F.3d at 407 (declining "to hold that any potential effect the doctrine [of stare decisis] may have on an absent party's rights makes the absent party's joinder compulsory under Rule 19(a) whenever 'feasible'").  Nevertheless, under general principles of collateral estoppel or issue preclusion, a strong argument can be made that WALP would be bound.[10]  Moreover, during the district court proceedings WALP agreed to be bound by the district court's determination on the lease's existence.  We will therefore assume, without deciding, that WALP is a necessary party under

(..continued)
> subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent
> obligations by reason of the claimed
> interest.

Fed. R. Civ. P. 19(a) (in relevant part).

[10].  See Restatement (Second) of Judgments §§ 27-29 (1982). WALP's interests are the same as the mortgagee and the mortgagee had a full and fair opportunity to litigate the issue as well as every incentive to press its defense that no lease ever arose.

Rule 19(a) and go on to consider whether it is also indispensable under Rule 19(b).

### B.

The extent to which a judgment rendered in WALP's absence might be prejudicial to it or to those already parties to this case must be considered under Rule 19(b) as well as 19(a).[11] Prejudice under Rule 19(b), like impairment of an absent party's rights under Rule 19(a)(2)(i), implicates principles of collateral estoppel or issue preclusion. Under Pennsylvania law

---

[11]. Federal Rule of Civil Procedure 19(b) provides:

> **(b) Determination by Court Whenever Joinder not Feasible**. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: [1] to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; [2] the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; [3] whether a judgment rendered in the person's absence will be adequate; [4] whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

on issue preclusion,[12] a party may be precluded from relitigating an issue only if:

> "(1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action."

Janney, 11 F.3d at 409 n.12 (quoting Sanders v. Sanders, 558 A.2d 556, 560 (Pa. Super. Ct. 1989) (citation omitted), allocatur denied, 578 A.2d 930 (Pa. 1990)). Thus, if the landlord was in privity with J.P. Morgan and Widener and they adequately represented its interests, WALP would be collaterally estopped. See id. at 410. Yet, under Rule 19(b), unlike Rule 19(a), collateral estoppel is only a necessary condition of dismissal, not a necessary and sufficient condition.

Though it would be logically inconsistent for J.P. Morgan to succeed in this federal action on its defense that no lease existed with respect to the tortious interference claim, and the landlord to lose in the state court action because the state court decided the parties' actions and oral communications brought a lease into existence, logical inconsistency does not

---

[12]. The parties do not dispute that Pennsylvania law applies in this diversity action. All lease negotiations occurred in Pennsylvania, the object of the purported lease is located there, and the draft leases specifically provided that the lease was to be governed by Pennsylvania law.

make an absent party indispensable.  See Field v. Volkswagenwerk AG, 626 F.2d 293, 301-02 (3d Cir. 1980) ("[T]he possibility of a subsequent adjudication that may result in a judgment that is inconsistent as a matter of logic [does not] trigger the application of Rule 19.") (emphasis added).

In the district court, WALP offered to agree to be bound by any determination of the lease issue, even if not joined, provided Schulman would also agree to be bound.  WALP specifically informed the district court that it could

> submit an affidavit . . . in which it would agree to be bound by a decision rendered in this action as to the existence of a lease and would expect, in return, plaintiff's acknowledgement and stipulation that he would be bound by [the district court's] determination of the lease issue so that plaintiff would not seek to relitigate the issue in state court.  If WALP were to submit such an affidavit and plaintiff such an acknowledgment and stipulation, there would be no need to join WALP as a party defendant and there would be no possibility of further procedural wrangling in the state court on the lease issue.

Letter from Leonard S. Baum, Esq., counsel for Mortgagees, to District Court dated February 16, 1993, Exh. "B" of Memorandum of Law of Appellees to this Court dated March 11, 1994.  Schulman declined this offer and no such affidavit or stipulation was filed.  We think that Schulman, even absent this stipulation, would be bound by the district court's resolution of the issue concerning existence of the lease.  Given WALP's willingness to

be bound, any judgment rendered in WALP's absence would be mutually dispositive of the case.

C.

Because the mortgagee's counterclaim for a declaratory judgment on the lease's existence mirrors an essential element of Schulman's own claim, i.e. the existence of a lease, we do not think the district court abused its discretion when it concluded Schulman should not be able to demand WALP's presence as a condition of an order adjudicating the merits of the dispute over the lease's existence.[13] Dismissal under Rule 19(b) is subject to a district court's discretionary analysis of equitable considerations, as is its decision to entertain a request for a declaratory judgment. In either case we do not think the district court abused its discretion. The equities favor WALP and the mortgagee, not Schulman, because it was Schulman who chose to divide this dispute between two independent forums and then rejected WALP's proposal to stipulate that any decision in the district court would be binding on both of them in the ongoing state court proceedings. Accordingly, we conclude the district court had subject matter jurisdiction over the merits of

---

[13]. In addition, we think J.P. Morgan's interest in the lease Schulman asserts can be analogized to that of a third party beneficiary. According to Wright & Miller, "[i]n cases in which the beneficiary is a party, the courts uniformly reject the argument that all of the original parties to the contract must be joined." 7 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1613 at 186 (1986) (footnote omitted).

whether J.P. Morgan's counterclaim is treated as such or as no more than a redundant defense to Count I of Schulman's complaint. It therefore follows that we also have appellate jurisdiction to decide the issues the parties have raised about the lease's existence on their merits.

IV.

Turning to the merits of that issue, Schulman argues that a valid, enforceable lease exists because he relied on Kelter's assurances that he would obtain one as well as the FKB employees' confirmed acceptance of the final draft.[14] Schulman relies on Emerman v. Baldwin, 142 A.2d 440 (Pa. Super. Ct. 1958). There, defendants orally agreed to lease a house to plaintiffs for two years at a specified price. Id. at 443. Defendants acknowledged the agreement as to terms by letter but in the letter stated the agreement was nevertheless subject to execution and delivery of defendants' standard lease form. Id. Under the circumstances, the court held that the minds of the parties had met on the essential provisions of the lease and a valid leasehold agreement was made because the form's provisions were

---

[14]. The elements of intentional interference with existing contractual relations are: (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with those contractual relations; (3) the absence of privilege or justification for the interference; and (4) actual damages resulting from the defendant's conduct. Neish v. Beaver Newspapers, Inc., 581 A.2d 619, 625 (Pa. Super. Ct.), allocatur denied, 593 A.2d 421 (Pa. 1990).

known to plaintiffs and the defendants believed the negotiations had resulted in a binding contract.  Id. at 445.

Emerman is distinguishable from this case.  The defendants in Emerman expressed their willingness to accept the terms agreed upon during the negotiations as a binding contract and objectively indicated they intended the executed standard form would be a mere formality, serving only as evidence of the agreed upon terms.  In contrast, here WALP always made clear its intent not to be bound by any lease until a written lease was executed.  Paragraph 57 of the January 31, 1992, draft lease, which Schulman contends embodies all of the terms of the purported lease, expressly bars any agreement from taking effect until both the landlord and tenant have signed and delivered it. It provides in a distinctive, capitalized typeface:

> 57.  Delivery For Examination.  DELIVERY OF THE LEASE TO TENANT SHALL NOT BIND LANDLORD IN ANY MANNER, AND NO LEASE OR OBLIGATIONS OF LANDLORD SHALL ARISE UNTIL THIS INSTRUMENT IS SIGNED BY BOTH LANDLORD AND TENANT AND DELIVERY IS MADE TO EACH.

App. at A-150.  Schulman was on notice of WALP's intent not to be bound until it signed the lease throughout the negotiations. Schulman and his attorneys reviewed each of the four draft leases.  All contained this provision and they never objected to it.  Schulman's attorney expressly cautioned him on the necessity of formal execution.  Schulman concedes WALP never signed any of the draft leases.

Despite the clear language of paragraph 57, Schulman argues that the January 31, 1992, draft lease and the two letters he received from FKB employees in February 1992 create a sufficient writing to evidence the lease terms. His argument might be sufficient to overcome the defense of the statute of frauds, but the issue here is whether parties whose minds had met on the need for a formal fully executed document before any binding contract arose consummated their agreement, not whether there was sufficient written evidence of the proposed terms of that agreement. Paragraph 57 explicitly requires the signing and delivery of the lease itself. The letters' references to the draft as a lease did not transform it into one. Under Pennsylvania law, when one party has expressed an intent not to be bound until a written contract is executed, the parties are not bound until that event has occurred. See Essner v. Shoemaker, 143 A.2d 364 (Pa. 1958). In this case, no lease could exist until WALP executed and delivered it.[15] In response to the mortgagee's motion for summary judgment, Schulman points to nothing that could create a genuine issue of fact on the

_____

[15]. Schulman argues the district court exceeded or abused its authority under the Declaratory Judgment Act by ruling on the existence of the lease. We agree with the dissent that the district court could have decided this case by assuming the lease existed and so refusing to reach or decide the mortgagees' counterclaim for a declaratory judgment. We are unable to agree, however, that it was inappropriate for the district court to rule on the counterclaim. Resolution of the existence of a lease is essential to disposition of Schulman's claim of intentional interference with existing contractual relations. Therefore, we have also considered the merits of the lease issue and concluded that no lease existed.

existence of a binding lease.  For the same reasons, Schulman's alternate argument based on Valvano v. Galardi, 526 A.2d 1216, 1220 (Pa. Super. Ct. 1987) that commencement of operations and payment of rent to WALP is part performance sufficient to take the case outside Pennsylvania's statute of frauds, Pa. Stat. Ann. tit. 68, § 250.202 (1994), also fails.  The district court did not err by granting summary judgment in favor of the mortgagees on Schulman's claim for intentional interference with existing contractual relations.


V.

Schulman also asserts a claim for intentional interference with prospective contractual relations.[16]  To succeed, Schulman must show the prospective contract has an objectively reasonable probability of coming into existence.  See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979). We think there is sufficient evidence in this record to withstand summary judgment on the issue of whether Schulman had a reasonable probability of obtaining a lease from WALP absent the mortgagee's interference.[17]  We must therefore consider whether the mortgagee's conduct was privileged.[18]

---

[16].  The elements of this tort are: (1) a prospective contractual relation; (2) intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on the defendant's part; and (4) resulting damage. See Silver v. Mendel, 894 F.2d 598, 601-02 (3d Cir.) (citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979)), cert. denied, 496 U.S. 926 (1990).

[17].  We believe there is a genuine issue of fact as to whether there was a reasonable probability of Schulman's obtaining a

The Pennsylvania Supreme Court has "repeatedly looked to the Restatement as authority for the elements of a cause of action for intentional interference with existing contract relations." Adler, Barish, Daniels, Levins & Creskoff v. Epstein, 393 A.2d 1175, 1182 n.13 (Pa. 1978) (adopting Restatement of Torts §§ 766, 767 as definition of intentional interference), appeal dismissed and cert. denied, 442 U.S. 907 (1979). It has also adopted portions of the Restatement relating to intentional interference with prospective contractual relations. See Glenn v. Point Park College, 272 A.2d 895, 897 (Pa. 1971). Section 769 of the Restatement (Second) of Torts excuses interference committed by a person with a financial interest in another's business if that interest may be affected

(..continued)
lease absent the mortgagee's interference. Although Schulman argues Kelter did not begin communicating his displeasure with Maxi's until after speaking with Pfeiffer, he conceded in deposition and hearing testimony in the state ejectment action that Kelter began complaining almost immediately after Maxi's opened. That opening, in Schulman's own words, occurred "on or about December 2, 1991, well before the grand opening party" on December 12, 1991 and prior to Pfeiffer communicating her displeasure. Thus, Kelter's opinion may have been uninfluenced by Pfeiffer. Nevertheless, Schulman might have been able to get Kelter to change his mind absent the mortgagee's objections because Kelter initially appeared willing to work out the problems he noted and suggested various improvements after expressing his displeasure.

[18]. The Pennsylvania Supreme Court has not adopted the language of the Restatement (Second) of Torts § 766B (1977) that favors an analysis of "proper" conduct rather than "privileged." Thus, in cases to which Pennsylvania law applies, we must consider privilege in analyzing claims of interference with prospective contractual relations. See Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991).

by commercial relations between others.  Restatement (Second) of

Torts § 769 (1979).  It provides:

> One who, having a financial interest in the
> business of a third person[,] intentionally
> causes that person not to enter into a
> prospective contractual relation with
> another, does not interfere improperly with
> the other's relation if he
>
> (a)  does not employ wrongful means and
>
> (b)  acts to protect his interest from
> being prejudiced by the relation.

Id. (emphasis added); see also Yaindl v. Ingersoll-Rand Co., 422

A.2d 611, 625 (Pa. Super. 1980) (citing Restatement (Second) of

Torts § 769 approvingly), abrogation on other grounds recognized

by Yetter v. Ward Trucking Co., 585 A.2d 1022 (Pa. Super. Ct.

1991) (citing Paul v. Lankenau Hosp., 569 A.2d 346 (Pa. 1990) and

Clay v. Advanced Computer Applications, 559 A.2d 917 (Pa. 1989)).

As the district court recognized, illustration 1 to that section

is similar to this case.  Illustration 1 provides:

> A provides the financial backing for B's
> theatrical production.  The arrangement is in
> the form of a loan for the purposes of the
> production.  While B undertakes to repay the
> loan in any event, in fact the chances of
> repayment depend upon the success of the
> play.  B is about to engage C to play the
> leading role.  Under the conditions stated in
> Clauses (a) and (b), A's interference with
> the prospective relation by causing B not to
> have C play that role is not improper.

Restatement (Second) of Torts § 769 cmt. c, illus. 1.  The

interest of a mortgage lender is clearly an economic or financial

interest that falls within the scope of the privilege.  See,

e.g., Cloverleaf Dev., Inc. v. Horizon Fin. F.A., 500 A.2d 163, 167 (Pa. Super. Ct. 1985) (lender acted in its own financial interest by demanding higher interest rate, thereby interfering with sale of mortgage).

Here, the mortgagee who is charged with interference loaned WALP $62 million for renovations; of that amount only $56,280 was allocated to Maxi's. Schulman argues this minimal financial interest is insufficient to justify the mortgagee's conduct. Schulman also argues the mortgagee's aesthetic concerns are invalid because there is no evidence Schulman could not pay the rent as agreed. Schulman misses the point. J.P. Morgan has $62 million tied up in the Widener Building and if the building doesn't succeed in attracting up-scale tenants, J.P. Morgan's ability to recoup its loan is jeopardized. To the extent Maxi's appearance would harm the building's ability to attract first-class tenants, J.P. Morgan's concerns are valid. WALP implicitly acknowledged this by granting the mortgagee the right to disapprove tenants.

Interference is also privileged when the actor believes in good faith that his legally protected interest may otherwise be impaired by the performance of the contract. See Advent Sys., Ltd. v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991); Geofreeze Corp. v. C. Hannah Constr. Co., 588 F. Supp. 1341, 1345 (E.D. Pa. 1984); Cloverleaf, 500 A.2d at 168. Section 773 of the Restatement (Second) of Torts excuses interference by persons protecting legal interests. Restatement (Second) of Torts § 773 (1979). It provides:

> One who, by asserting in good faith a <u>legally protected interest</u> of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

<u>Id.</u> (emphasis added); <u>see also</u> <u>Kelly-Springfield Tire Co. v. D'Ambro</u>, 596 A.2d 867, 872 (Pa. Super. Ct. 1991) (relying on Restatement (Second) of Torts section 773); <u>Geofreeze</u>, 588 F. Supp. at 1345-46 (citing section 773 approvingly). The Restatement gives an actor this defense only if it has a legally protected interest and, in good faith, asserts the interest or threatens to protect it by appropriate means. Restatement (Second) of Torts § 773 cmt. a.

The Mortgage and Loan Documents WALP and Widener executed expressly prohibit WALP from entering into any lease without Widener's prior written consent. Section 6.01.1 of the Mortgage forbids WALP from executing leases without the mortgagee's written consent. Section 9.01(k) makes WALP's sale, conveyance, encumbrance, or other transfer of control without the mortgagee's prior written consent an event of default. Section 10.01 again forbids transfers of any kind without the mortgagee's prior written consent. WALP also covenanted in section 4(k) of the Assignment of Leases to Equitable Life that it would:

> [n]ot lease any part of the Property, or renew or extend the term of any Lease of any

> part of the Property without, in each case,
> the prior written consent of the Assignee or
> as expressly provided for in the Loan
> Agreement[.]

App. at A–410.[19]  In the instant case, Widener acted in good faith pursuant to its own reserved, contractual right in the mortgage and loan documents between it and WALP to oversee the selection of the Widener Building tenants.[20]

---

[19].  The only exception to the written approval requirement is that leases may be granted without the lender's approval if done "in strict accordance with the provisions of the Loan Agreement." App. at A–399.  The Loan Agreement exempts only those leases which "prior to the Closing, . . . demise[] less than 5,000 square feet of Rentable Area and which otherwise compl[y]" with the other agreement provisions.  App. at A–427.  Although Schulman's space occupies only 1,407 square feet, he does not contend his lease took effect "prior to the Closing," which occurred on June 8, 1990.

[20].  Schulman argues Pennsylvania law does not require a prospective tenant to search the public records for a mortgage that may have restricted the landlord's right to lease the property in question.  Generally, under Pennsylvania law a mortgage, recorded or not, does not affect title to property, but a lessee's interest may nevertheless be subordinated to a mortgage, as reflected in Schulman's draft lease.  See DeMarco v. City of Philadelphia, 494 A.2d 875, 876 (Pa. Commw. Ct. 1985). Our research has not revealed any Pennsylvania cases directly supporting either party's position on the issue of record notice. The draft leases, however, all contained a subordination clause putting Schulman on constructive notice of the existence of mortgage documents.  Schulman also knew Pfeiffer was connected with the lender and that she wanted to review the draft leases.

Whether notice of the mortgagee's interest and the tenant's express subordination to the rights of the mortgagee allow J.P. Morgan to proceed directly against WALP, the owner, is thus a question we do not decide.  It is unnecessary to resolve it because WALP never executed a lease and Widener clearly reserved its right to approve Schulman's lease and its acts to that end are privileged under Restatement (Second) of Torts § 773.

Thus, the mortgagee's conduct is not improper based on both its financial and legal interests in the transaction.

VI.

For the foregoing reasons the order of the district court will be affirmed.

ROBERT D. SCHULMAN, t/a MAXI'S EXPRESS, Appellant v.
J.P. MORGAN INVESTMENT MANAGEMENT, INC.; WIDENER FUNDING CORP.,
INC., No. 93-1888

_____

ROSENN, Circuit Judge, concurring and dissenting.

I agree with the majority's conclusion that the district court did not err by granting summary judgment in favor of the defendants on Schulman's claim for intentional interference with existing contractual relations.  However, I part company with the majority's characterization of J.P. Morgan's counterclaim and its decision to sustain the district court's ruling on the amended counterclaim involving the existence of a lease between Schulman and Widener Associates Limited Partnership (WALP).  I therefore respectfully concur and dissent.

I.

This is an action by Schulman against the defendants for intentional interference in contractual relations.  Before

Schulman initiated this action, WALP filed an ejectment action in the Philadelphia County Court of Common Pleas to evict Schulman. That action, which was pending at the time Schulman filed this suit, inevitably must test the existence of a lease between the Schulman and WALP. There was no point, therefore, for the district court to decide an issue already pending in the state court and which was not essential to the disposition of the matter before it. In this federal action, the issue is limited to whether the defendants intentionally interfered with Schulman's contractual rights.

The majority concedes that the district court could have disposed of this case by assuming, without deciding, that WALP and Schulman had agreed upon the terms of the lease. Moreover, as discussed by the majority in Part III, the defendants acted in good faith pursuant to their contractual rights to protect their legal interests. Therefore, even assuming the existence of a lease, the defendants' actions were privileged and did not constitute intentional interference.

The district court should not have decided the question of whether Schulman had a valid lease to any space at the Widener Building because that issue was pending in the state court action, essentially involves a matter of state law, and the elements for a declaratory judgment were not present.[21] The

---

[21]. The defendants contend that this court does not have jurisdiction to decide whether the district court erred in granting summary judgment for them on their counterclaim because Schulman only appealed from the August 11, 1993 Order granting

Declaratory Judgment Act, 28 U.S.C. § 2201, calls for the federal courts to exercise discretion in determining whether to involve themselves in a declaratory judgment action.  As set forth most recently by this court in United States v. Pennsylvania, Dep't of Envtl. Resources, 923 F.2d 1071 (3d Cir. 1991), this court considers the following factors when determining whether the federal forum is appropriate for a declaratory action: (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; and (4) the availability of and relative convenience of other remedies.  Id. at 1075 (citations omitted).

The Pennsylvania, Dep't of Envtl. Resources court also discussed Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213 (3d Cir. 1989), in which the court upheld the district court's stay of an insured's claim in light of a pending state tort action because of the general policy of restraint when the same issues are pending in a state court and an avoidance of duplicative litigation.  923 F.2d at 1075-76; see also Brillhart v. Excess Ins. Co., 316 U.S. 491, 495 (1942) (federal court should consider

(..continued)
summary judgment in favor of the defendants, and not from the April 27, 1993, Order granting the defendants leave to amend their answer to include the counterclaim.  However, the August 11, 1993 Order from which Schulman appealed specifically granted the defendants' motion for summary judgment on their counterclaim and declared that Schulman had no legally enforceable lease.

whether state court suit "present[s] the same issues, not governed by federal law, between the same parties" and whether state court is better able to settle controversy). "[E]ven if a declaratory judgment would clarify the parties' legal rights, it should ordinarily not be granted unless 'the parties' plans of actions are likely to be affected by a declaratory judgment.'" Armstrong World Industries, Inc. v. Adams, 961 F.2d 405, 412 (3d Cir. 1992) (citation omitted).

The district court's decision to resolve the declaratory action raised by the counterclaim substantially ignores these factors. The federal action can be resolved without deciding the essential issue in the pending state court ejectment action. There is no public interest involved in either action and the state action provides an available and convenient forum for the disposition of a contractual suit arising under state law. The declaratory judgment did not serve any useful purpose because the declaration was not necessary for the settlement of obligations between the parties in this case or for the disposal of this action.

The declaration of the district court improperly encroaches upon the state court, which is currently addressing the issue of the existence of a lease between Schulman and WALP. The district court acknowledged that its declaration that there was not a valid contract between Schulman and WALP "may not resolve the question still pending . . . in state court regarding

what rights Schulman has against a landlord who allegedly represents it can freely enter into a lease, when in fact it cannot." The district court's declaration will have the effect of either binding the state court in its decision making or requiring Schulman to undertake duplicative litigation. In any event, it can only serve to complicate or confuse the state court proceedings. The majority's ruling on the lease is not necessary to this action and relies on a matter in which a key figure to the lease is not a party to the proceedings before this court. Finally, the parties would not be inconvenienced by deference to the state court because the federal action properly granted the defendants' motion for summary judgment on Schulman's claims against them, and the state court could resolve in timely fashion the issue of the existence of a lease. Thus, I believe this court should reverse the district court's grant of summary judgment for the defendants on their counterclaim.

## II.

Additionally, the majority's extensive discussion of Rule 19 is not necessary or relevant to the disposition of this appeal. As the majority concedes, the district court had ancillary jurisdiction over the issue raised in the counterclaim without regard to diversity under 28 U.S.C. § 1367 (West 1993). (Maj. Op. at 12). I further disagree with the majority's characterization of J.P. Morgan's counterclaim as a redundant defense. This issue has never been raised by the parties and

there is no indication that J.P. Morgan did not intend to file a counterclaim for a declaratory judgment.

As authority for its "relabeling" the counterclaim as a defense, the majority cites Fed.R.Civ.P. 8(c). Rule 8(c), however, empowers a trial court at the pleading stage to correct a party's mistaken designation of a counterclaim as a defense if justice so requires. The rule does not provide any authority for this court to do so on appeal. Rather, our review is constrained by the district court's treatment of the pleading as a counterclaim. Therefore, I see no justification to relabel J.P. Morgan's counterclaim as a defense, and no need to discuss Rule 19 in light of the district court's ancillary jurisdiction over the counterclaim.

Moreover, the majority concludes that the equities favor WALP and the defendants, and not Schulman, because Schulman chose to divide this dispute between two independent forums and then rejected WALP's proposal to stipulate that any decision in the district court would be binding in the state court. (Maj. Op. at 19). However, WALP, not Schulman, chose to file the ejectment action in the Philadelphia County Court of Common Pleas. Moreover, there was no reason for Schulman to stipulate to a binding resolution by the district court because that court was not the appropriate forum for resolution of an issue essentially involving state law pending in a prior action instituted by WALP in state court. Finally, the equities may

fall in favor of Schulman in the ejectment action because Kelter, the principal acting on WALP's behalf, sought out Schulman to discuss plans to operate Maxi's food establishment in the lobby of the Widener Building. "It is undisputed that both Kelter and Schulman anticipated that a lease would be executed" and Schulman invested $35,000 of his own money toward construction costs. (Maj. Op. at 5).

### III.

In conclusion, the district court should not have decided the question presented by the defendants' counterclaim as to whether there was in fact a lease because the elements for a declaratory judgment were not present. Furthermore, the declaration of the district court improperly encroaches upon the litigation then pending in the state court. Accordingly, I respectfully dissent from the majority's opinion.